# 22-3091

*To Be Argued By*:
JARROD L. SCHAEFFER

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 22-3091

➤➤➤

UNITED STATES OF AMERICA,

—v.— *Plaintiff-Appellant*,

BRIAN BENJAMIN,

*Defendant-Appellee*,

GERALD MIGDOL, also known as Sealed Defendant 1,
also known as Gerald Migol,

*Defendant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*,
*Attorney for the United States*
*of America*.
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

JARROD L. SCHAEFFER,
HAGAN SCOTTEN,
*Assistant United States Attorneys*,
*Of Counsel*.

# TABLE OF CONTENTS

PAGE

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Issue Presented for Review . . . . . . . . .  2

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.   Procedural History . . . . . . . . . . . . . . . . . . . . .  2

    B.   Benjamin's Bribery Scheme . . . . . . . . . . . . .  3

    C.   The District Court's Decision . . . . . . . . . . .  7

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . .  10

ARGUMENT—The District Court Erred in
    Dismissing the Bribery Counts . . . . . . . . . . .  13

    A.   Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  13

        1.   Standard of Review . . . . . . . . . . . . . . .  13

        2.   Bribery Involving Campaign
            Contributions . . . . . . . . . . . . . . . . . . . . .  13

    B.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

        1.   *McCormick* Does Not Require an Express
            *Quid Pro Quo* . . . . . . . . . . . . . . . . . . . . .  15

        2.   This Court's Precedent Does Not Require
            an Express *Quid Pro Quo* . . . . . . . . . .  23

        3.   The District Court's Reasoning Does Not
            Support an Express *Quid Pro Quo*
            Requirement . . . . . . . . . . . . . . . . . . . . .  33

ii

PAGE

4.   The Bribery Counts Are
     Sufficiently Pled. . . . . . . . . . . . . . .   43

     a.   The Bribery Counts Sufficiently
          Allege a *Quid Pro Quo* . . . . . . . . .   43

     b.   The Bribery Counts Sufficiently
          Allege Crimes . . . . . . . . . . . . . . .   47

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . .   54

## TABLE OF AUTHORITIES

*Cases*:

*Brown v. Davenport*,
    142 S. Ct. 1510 (2022). . . . . . . . . . . . . . . . . . . . . . . 29

*Evans v. United States*,
    504 U.S. 255 (1992). . . . . . . . . . . . . . . . . . . *passim*

*Hamling v. United States*,
    418 U.S. 87 (1974). . . . . . . . . . . . . . . . . . . . . . . . 44

*Holland v. United States*,
    348 U.S. 121 (1954). . . . . . . . . . . . . . . . . . . . . . . 22

*Jimenez v. Walker*,
    458 F.3d 130 (2d Cir. 2006) . . . . . . . . . . . . . 26, 27

*Magwood v. Patterson*,
    561 U.S. 320 (2010). . . . . . . . . . . . . . . . . . . . . . . 37

*McCormick v. United States*,
    500 U.S. 257 (1991). . . . . . . . . . . . . . . . . . . *passim*

iii

PAGE

*Morissette v. United States*,
    342 U.S. 246 (1952) . . . . . . . . . . . . . . . . . . . . . . . 53

*Rosemond v. United States*,
    572 U.S. 65 (2014) . . . . . . . . . . . . . . . . . . . . . . 21, 38

*Skilling v. United States*,
    561 U.S. 358 (2010) . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 51

*United States v. Alfonso*,
    143 F.3d 772 (2d Cir. 1998) . . . . . . . . . . 13, 50, 52

*United States v. Allinson*,
    27 F.4th 913 (3d Cir. 2022) . . . . . . . . . . . . . . 16, 18

*United States v. Bahel*,
    662 F.3d 610 (2d Cir. 2011) . . . . . . . . . . . . . . 29, 31

*United States v. Bell*,
    524 F.2d 202 (2d Cir. 1975) . . . . . . . . . . . . . . . . . 27

*United States v. Blagojevich*,
    794 F.3d 729 (7th Cir. 2015) . . . . . . . . . . . . *passim*

*United States v. Blandford*,
    33 F.3d 685 (6th Cir. 1994) . . . . . . . 17, 36, 43, 44

*United States v. Brewster*,
    408 U.S. 501 (1972) . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Carpenter*,
    961 F.2d 824 (9th Cir. 1992) . . . . . . . . . . . . *passim*

*United States v. Cassino*,
    467 F.2d 610 (2d Cir. 1972) . . . . . . . . . . . . . . . . . 21

iv

PAGE

*United States v. Correia,*
   55 F.4th 12 (1st Cir. 2022) . . . . . . . . . .   17, 24, 35

*United States v. Coyne,*
   4 F.3d 100 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . 30

*United States v. Davis,*
   841 F. App'x 375 (3d Cir. 2021) . . . . . . .   27, 36, 44

*United States v. Dawkins,*
   999 F.3d 767 (2d Cir. 2021) . . . . . . . . . . . . . . 49, 52

*United States v. De La Pava,*
   268 F.3d 157 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 13

*United States v. Donagher,*
   520 F. Supp. 3d 1034 (N.D. Ill. 2021) . . . . . . . . . 44

*United States v. Dozier,*
   672 F.2d 531 (5th Cir. 1982) . . . . . . . . . . . . . 19, 35

*United States v. Evans,*
   910 F.2d 790 (11th Cir. 1990) . . . . . . . . . . . . . . . 34

*United States v. Friedman,*
   854 F.2d 535 (2d Cir. 1988) . . . . . . .   11, 22, 28, 38

*United States v. Ganim,*
   510 F.3d 134 (2d Cir. 2007) . . . . . . . . . . . . *passim*

*United States v. Garcia,*
   992 F.2d 409 (2d Cir. 1993) . . . . . . . .   8, 24, 27, 30

*United States v. Goldberg,*
   756 F.2d 949 (2d Cir. 1985) . . . . . . . . . . . . . . . . . 13

*United States v. Gonzalez-Roque,*
   301 F.3d 39 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . 13

v

PAGE

*United States v. Halloran,*
821 F.3d 321 (2d Cir. 2016) . . . . . . . . . . . . . . . . 40

*United States v. Heicklen,*
858 F. Supp. 2d 256 (S.D.N.Y. 2012) . . . . . . . . . 51

*United States v. Inzunza,*
638 F.3d 1006 (9th Cir. 2011) . . . . . . . . . . . . . . 39

*United States v. Jennings,*
160 F.3d 1006 (4th Cir. 1998) . . . . . . . . . . . . . . 48

*United States v. Kerik,*
615 F. Supp. 2d 256 (S.D.N.Y. 2009) . . . . . . . . . 51

*United States v. Lanier,*
520 U.S. 259 (1997) . . . . . . . . . . . . . . . . . . . . . 41, 42

*United States v. Laurent,*
33 F.4th 63 (2d Cir. 2022) . . . . . . . . . . . . . . . . . 47

*United States v. MacPherson,*
424 F.3d 183 (2d Cir. 2005) . . . . . . . . . . . . . . . . 22

*United States v. McGregor,*
879 F. Supp. 2d 1308 (M.D. Ala. 2012) . . . . . . . . 41

*United States v. Mennuti,*
639 F.2d 107 (2d Cir. 1981) . . . . . . . . . . . . . . . . 52

*United States v. Moseley,*
980 F.3d 9 (2d Cir. 2020) . . . . . . . . . . . . . . . . . . 41

*United States v. Myers,*
692 F.2d 823 (2d Cir. 1982) . . . . . . . . . . . . . . 22, 39

*United States v. Ng Lap Seng,*
934 F.3d 110 (2d Cir. 2019) . . . . . . . . . . . . . . . . 43

vi

PAGE

*United States v. Oshatz,*
    912 F.2d 534 (2d Cir. 1990) . . . . . . . . . . . . . . 28, 29

*United States v. Pawlowski,*
    2017 WL 11350965 (E.D. Pa. Dec. 5, 2017). . . . . 46

*United States v. Pawlowski,*
    27 F.4th 897 (3d Cir. 2022) . . . . . . . . . . . . . . 40, 44

*United States v. Pirro,*
    212 F.3d 86 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 51

*United States v. Rigas,*
    490 F.3d 208 (2d Cir. 2007) . . . . . . . . . . . . . . . . 13

*United States v. Rooney,*
    37 F.3d 847 (2d Cir. 1994) . . . . . . . . . . . . . . . . . 47

*United States v. Rosen,*
    716 F.3d 691 (2d Cir. 2013) . . . . . . . . . .   30, 31, 40

*United States v. Salameh,*
    152 F.3d 88 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 22

*United States v. Sampson,*
    898 F.3d 270 (2d Cir. 2018) . . . . . . . . . . . . . . 50, 52

*United States v. Santeramo,*
    45 F.3d 622 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 45

*United States v. Seminerio,*
    2010 WL 3341887 (S.D.N.Y. Aug. 20, 2010) . . . . 46

*United States v. Siegelman,*
    640 F.3d 1159 (11th Cir. 2011) . . . .   17, 18, 27, 36

*United States v. Silver,*
    948 F.3d 538 (2d Cir. 2020) . . . . . . .   30, 31, 34, 47

vii

PAGE

*United States v. Svoboda,*
   347 F.3d 471 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 21

*United States v. Taylor,*
   966 F.2d 830 (4th Cir. 1992) . . . . . . . . . . . . . . . 34

*United States v. Terry,*
   707 F.3d 607 (6th Cir. 2013) . . . . . . . . . . . *passim*

*United States v. Tomblin,*
   46 F.3d 1369 (5th Cir. 1995) . . . . . . . . .   17, 28, 36

*United States v. Wedd,*
   993 F.3d 104 (2d Cir. 2021) . . . . . . . . . . . . . . . . 50

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 1951 . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18 U.S.C. § 666(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . 47

18 U.S.C. § 924(c) . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Fed. R. Crim. P. 7(c)(1) . . . . . . . . . . . . . . . . . . . . . . 49

Wayne LaFave *et al.,*
   5 CRIM. PROC. (4th ed.) (2021) . . . . . . . . . . . . 45

*Evans v. United States,*
   1991 WL 527604 (U.S. Pet. Brief, 1991) . . . . . . . 35

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 22-3091

———————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

—v.—

BRIAN BENJAMIN,

*Defendant-Appellee,*

GERALD MIGDOL, also known as Sealed Defendant 1,
also known as Gerald Migol,

*Defendant.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

### Jurisdictional Statement

The United States of America appeals from an order entered on December 5, 2022, in the United States District Court for the Southern District of New York, by the Honorable J. Paul Oetken, United States District Judge, dismissing three counts of an indictment.

The Government filed a timely notice of appeal on December 5, 2022. The jurisdiction of this Court is

2

invoked pursuant to 18 U.S.C. § 3731. The Solicitor General has authorized the prosecution of this appeal.

## Statement of Issue Presented for Review

Whether the District Court erroneously dismissed three counts of an indictment charging that the defendant, then a state senator, allocated $50,000 in state funds to a non-profit organization in exchange for campaign contributions procured by the businessman who controlled the non-profit, on the ground that the indictment did not allege that the agreement to exchange campaign contributions for state funds was "express."

## Statement of the Case

### A.  Procedural History

On April 11, 2022, a grand jury returned indictment S2 21 Cr. 706 (JPO) (the "Indictment"), charging the defendant, Brian Benjamin, in five counts. Count One charged Benjamin with conspiracy to commit bribery and honest services wire fraud, in violation of 18 U.S.C. § 371. Count Two charged Benjamin with soliciting bribes, in violation of 18 U.S.C. § 666(a)(1)(B). Count Three charged Benjamin with honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346. Counts Four and Five charged Benjamin with falsifying records, in violation of 18 U.S.C. § 1519.

On June 24, 2022, Benjamin moved to dismiss the Indictment. On December 5, 2022, the District Court

3

dismissed Counts One through Three.[1] The Government appealed. Trial on the remaining counts was adjourned pending this appeal.

## B. Benjamin's Bribery Scheme

Benjamin served as a New York state senator from 2017 to 2021. (A. 2).[2] In 2019, Benjamin agreed to allocate $50,000 in state funds to a non-profit organization controlled by Gerald Migdol, a real estate developer in Benjamin's district, in exchange for campaign contributions provided by Migdol. (A. 1). Benjamin then tried to conceal the scheme, including by falsifying campaign forms, misleading regulators, and providing false information during a background check for Benjamin's later appointment as New York's Lieutenant Governor. (A. 1-2).

–––––––––––

[1] The District Court denied the motion to dismiss Counts Four and Five. That ruling is not at issue here. *See* 18 U.S.C. § 3731 (permitting an appeal by the United States from an order dismissing an indictment "as to any one or more counts, or any part thereof").

[2] "A." refers to the appendix filed with this brief. "Dkt." refers to an entry on the District Court's docket for this case. The District Court's opinion is included in the appendix and also available at *United States v. Benjamin*, No. 21 Cr. 706 (JPO), 2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022). Unless otherwise noted, case text quotations omit all internal alterations, quotation marks, and citations.

4

Benjamin and Migdol first met in 2017. For several years, Migdol made contributions to Benjamin's state senate campaign and provided funds for events Benjamin promoted. Benjamin in turn attended events with Migdol and for his non-profit, Friends of Public School Harlem or "FPSH." (A. 2).[3]

In early 2019, Benjamin began planning a campaign for New York City Comptroller. In March 2019, Benjamin met with Migdol. Benjamin told Migdol that he intended to run for comptroller, and asked Migdol to procure numerous small contributions for his campaign. Migdol demurred for several reasons, including that any potential donors were likely the same people from whom Migdol had sought (and intended to seek) donations for FPSH. Benjamin responded, "Let me see what I can do." (A. 3-5).

About two months later, Benjamin learned that he could allocate up to $50,000 in state grants to certain school districts, libraries, and non-profit organizations in his district. (A. 6). The next day, Benjamin called Migdol and said he intended to allocate the full $50,000 to FPSH. (A. 6). In directing the grant to FPSH, Benjamin ignored another eligible non-profit for which he previously—and unsuccessfully—had sought funds before the March 2019 meeting at which Migdol declined Benjamin's fundraising request. (A. 5-6). Benjamin had never sought funds for FPSH before

--------

[3]  In the Indictment, Migdol is described as "CC-1" and FPSH as "Organization-1." Both were publicly identified during subsequent litigation.

5

Migdol's statement that soliciting contributions for FPSH would prevent him from soliciting contributions for Benjamin. (A. 5). After Benjamin told Migdol about the grant, Migdol understood Benjamin to be offering a *quid pro quo*—$50,000 to fund FPSH in return for Migdol providing contributions to Benjamin. (Dkt. 52-2 at 2-3).

On June 19, 2019, the state senate allocated $50,000 to FPSH at Benjamin's request. (A. 6-7). The next day, Benjamin exchanged text messages with Migdol showing the grant had been allocated. (A. 7). Although $50,000 was now designated for FPSH, Benjamin had not surrendered his leverage. The grant still required agency approval and would not be disbursed for some time; until it was, Benjamin could unilaterally withdraw it. (A. 6-7, 10).

On July 8, 2019, Migdol met Benjamin in his senate office and provided three checks to Benjamin's senate campaign totaling $25,000. Those checks bore the names of other people and a company Migdol controlled, but Migdol made clear to Benjamin that the checks came from Migdol himself. Benjamin accepted the checks, and had Migdol complete forms to paper over the fraudulent contributions. (A. 7-9).

Migdol provided three large contributions, rather than the numerous small-dollar contributions Benjamin had requested, because he did not want to gather small donations, and believed three large donations to Benjamin's senate campaign would suffice. (Dkt. 54-3 at 2; A. 8). Benjamin, however, was not satisfied with the large contributions. He reminded Migdol about the grant and his expectation that Migdol would secure

6

small-dollar donations for his comptroller campaign. (A. 8). Unbeknownst to Migdol, many small-dollar contributions from different people helped Benjamin far more than a few large ones, because New York City has a public matching funds program for smaller donations, which provides up to $8 in public funds for each $1 of eligible contributions. For example, a $250 contribution could result in up to $2,000 in matching funds. (A. 3, 9-10).

In September 2019, one week before Benjamin became eligible to receive contributions to his comptroller campaign, Benjamin again reminded Migdol of the grant by presenting Migdol and FPSH with an oversized novelty check in the amount of $50,000. (A. 9). Then in October 2019, Benjamin called Migdol to specify the precise kinds of contributions he expected Migdol to obtain. (A. 9-10).

Consistent with Benjamin's requests, Migdol subsequently procured contributions for Benjamin's comptroller campaign, many of which listed false donor names and some of which were secretly funded by Migdol himself. (A. 9-10). Benjamin kept tabs on Migdol's efforts, communicating with him about contributions he collected, arranging pick-ups, and urging Migdol to get more. (A. 10). And while Migdol worked to procure contributions for Benjamin, FPSH tried to complete the administrative process necessary to ensure the grant would be disbursed. (A. 10-11). Those efforts ceased in January 2021, after news stories linked Migdol to fraudulent contributions received by Benjamin's campaign. (A. 11).

7

Benjamin and others took steps to conceal his arrangement with Migdol. (A. 12-15). Among other things, Benjamin made false statements to regulators in which he claimed that people other than Migdol had procured donations that Benjamin knew Migdol had delivered. (A. 13). And on a background check for his nomination for Lieutenant Governor, Benjamin falsely claimed that he had never exercised legislative authority in any matter concerning someone from whom he solicited contributions, even though he had sought the $50,000 grant for FPSH, Migdol's non-profit. (A. 14-15).

## C.   The District Court's Decision

Benjamin moved to dismiss Counts One through Three, arguing primarily that (*i*) they did not allege any cognizable promises or agreements; (*ii*) they failed to allege an "explicit" *quid pro quo* as required by *McCormick v. United States*, 500 U.S. 257 (1991); and (*iii*) the Government's evidence would be insufficient to prove bribery. (Dkt. 50 at 14-33). In response, the Government argued that (*i*) the Indictment's allegation that Benjamin had solicited and received contributions "in exchange for" the $50,000 grant sufficiently alleged a *quid pro quo*; (*ii*) Benjamin's proposed standard for defining an explicit *quid quo pro* misconstrued *McCormick*, was inconsistent with the Supreme Court's application of *McCormick* in *Evans v. United States*, 504 U.S. 255 (1992), and had been rejected by every circuit to consider the issue; and (*iii*) the Indictment did not—and was not required to—set forth all evidence the Government would offer at trial, so whether that evidence would prove the requisite *quid*

8

*pro quo* could not be assessed until after trial. (Dkt. 54 at 2-20).

The District Court dismissed the bribery counts, concluding "that the Indictment fails to allege an explicit *quid pro quo*, which is an essential element of the bribery and honest services wire fraud charges brought against Benjamin." (A. 24). The District Court read *McCormick* and *Evans* as establishing "two distinct definitions of *quid pro quo*." (A. 34). Specifically, it stated that a "*quid pro quo* under *McCormick* must involve a payment made in return for an explicit promise or undertaking," but a "*quid pro quo* under *Evans* can be proven inferentially, based on the implication that an official has knowingly accepted a payment intended to compensate him for an official act." (A. 34). And although it acknowledged that *Evans* involved a bribe in the form of a campaign contribution, the District Court concluded that the purportedly different *Evans* standard did not apply in cases involving bribes paid as campaign contributions. (A. 33-36).

The District Court believed this conclusion compelled by language in two of this Court's decisions, *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007), and *United States v. Garcia*, 992 F.2d 409 (2d Cir. 1993). It held that those decisions had made "clear pronouncements" that *Evans* did not apply to bribery cases involving campaign contributions, while acknowledging that those "pronouncements" were arguably dicta, because neither *Ganim* nor *Garcia* actually concerned campaign contributions. (A. 35-38).

The District Court next sought to define *McCormick*'s requirement for an "explicit *quid pro quo*." It

9

stated that this Court "has unfortunately not supplied a clear definition of 'explicit.' " (A. 39). The District Court nonetheless read *Ganim* to equate "explicit" with "express." (A. 39). From there, the District Court reasoned that a bargain to exchange campaign contributions for an official action may not be criminal even if "the terms of the bargain were clear and unambiguous to the parties themselves." *(*A. 41). A clear and unambiguous agreement could be reached "based on unspoken assumptions, winks, and nods," making it the sort of *quid pro quo* discussed in *Evans*, which the District Court believed must differ from a *quid pro quo* under *McCormick*. (A. 40-41). The District Court also listed several additional reasons for its decision, such as the lower court's opinion in *Evans*, dictionary definitions, and constitutional concerns. (A. 41-50).

Applying that understanding to the Indictment, the District Court found the allegations that Benjamin solicited and received campaign contributions in exchange for the $50,000 grant did not satisfy *McCormick* because "'[i]n exchange for' is not synonymous with explicit or express." (A. 51). Again reasoning from its premise that *McCormick* and *Evans* impose different standards, the District Court explained that a "person gives something 'in exchange for' something else in any *quid pro quo*, whether an explicit *quid pro quo* under *McCormick* or an implicit *quid pro quo* under the *Evans* standard." (A. 51). Thus, because the Indictment did not allege "the existence of an explicit or express agreement," the District Court held that it was "[b]ound by guidance from the Second Circuit" to conclude that allegations that Benjamin exchanged $50,000 in state funds for campaign contributions

failed to charge an essential element of bribery. (A. 51-52).

The District Court also read *McCormick* to require that "the explicit agreement must precede the official conduct," and held that the Indictment's "timeline of events" failed to allege the requisite sequence. (A. 54-55). The District Court acknowledged that indictments need not contain all the facts the Government will prove at trial, and that the Government had confirmed that this Indictment did not contain all the facts it would prove in this case. (A. 56). The District Court nonetheless believed that the Indictment contained enough facts that it could be considered close to a "full proffer" of the evidence the Government would present at trial. (A. 56). And because the Indictment did not, in the District Court's view, reflect the sequence of events it believed *McCormick* required, the District Court concluded that the bribery counts failed to allege a crime. (A. 56-57).

### Summary of Argument

The District Court erred in dismissing the bribery counts. It found the allegations that Benjamin solicited and received contributions "in exchange for" allocating a $50,000 state grant insufficient to satisfy *McCormick*, but the Supreme Court has said that this formulation satisfies *McCormick*. The District Court ruled that *McCormick* prohibits federal bribery prosecutions except where the parties have reached an express agreement, but all six circuits to consider that question have disagreed. And allowing politicians to demand bribes so long as they avoid stating a demand

11

in so many words runs afoul of common sense and basic principles of criminal law, both of which recognize that criminal agreements are almost always formed—and proven—through inferences. *See, e.g.*, *United States v. Friedman*, 854 F.2d 535, 553 (2d Cir. 1988) ("Indeed, evidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions.").

The few sentences in *Ganim* and *Garcia* on which the District Court relied do not compel this result. To start, those sentences are dicta. Neither *Ganim* nor *Garcia* concerned campaign contributions, so their brief discussion of the standard applicable in campaign contribution cases had no bearing on their outcome. And although this Court's dicta often merit deference from district courts, the dicta here were of a different kind. They did not, for example, aim to provide guidance in future cases even if such guidance was unnecessary to deciding the case at hand. Rather, the characterizations of *McCormick* in *Ganim* and *Garcia* served only to describe a case that those opinions quickly found irrelevant to the questions they did address—precisely because *McCormick* concerned campaign contributions but *Ganim* and *Garcia* did not. In short, those decisions simply offered a short description of a precedent they found to be inapplicable, and did not set this Court at odds with *Evans*, every other circuit to consider the question, and its own cases concerning criminal agreements.

The District Court's other rationales also fail to sustain its ruling. An explicit *quid pro quo* under

12

*McCormick* need not be a *quid pro quo* openly expressed in any particular words, because—as other circuits have uniformly explained—an explicit *quid pro quo* means that the parties reached a clear and unambiguous agreement to exchange campaign contributions for official acts, not that the terms of the bribe were literally said aloud or memorialized in writing. Nor can *Evans* be distinguished on the ground that it did not concern campaign contributions, since by its own terms it involved a bribe paid as a contribution and examined jury instructions that applied to campaign contributions. And neither the First Amendment nor the Due Process Clause suggest immunizing politicians clever enough to demand bribes without expressly saying that they are doing so.

In addition, even if the District Court had not misinterpreted the substantive law, it still erred procedurally by dismissing the bribery counts. The District Court's understanding that the Government must not only prove an explicit *quid pro quo*, but include those words in the Indictment, finds no support in the law because explicitness is not an element of the bribery counts. Finally, the District Court's belief that the Indictment failed to allege an agreement at the time of Benjamin's official action assumed that the Government would not prove facts sufficient to sustain a conviction. But that can be determined only in a post-trial motion examining the evidence actually presented, not a pretrial motion to dismiss an indictment.

13

# **A R G U M E N T**

## **The District Court Erred in Dismissing the Bribery Counts**

### **A. Applicable Law**

#### **1. Standard of Review**

"The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001).

This Court reviews the dismissal of an indictment *de novo. United States v. Gonzalez-Roque*, 301 F.3d 39, 44 (2d Cir. 2002). In doing so, it accepts "as true all of the allegations of the indictment," and "[c]ontrary assertions of fact by the defendant will not be considered." *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985). The Court interprets an indictment "to include facts which are necessarily implied by the specific allegations made." *United States v. Rigas*, 490 F.3d 208, 229 (2d Cir. 2007). "An indictment . . . need not be perfect, and common sense and reason are more important than technicalities." *De La Pava*, 268 F.3d at 162. For that reason, to state an offense "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998).

#### **2. Bribery Involving Campaign Contributions**

In *McCormick*, the Fourth Circuit concluded that elected officials "may be convicted under the Hobbs Act

14

without proof that they have granted or agreed to grant some benefit or advantage in exchange for money" where they "receive[d] money other than 'legitimate' campaign contributions." 500 U.S. at 265-66. The Supreme Court reversed, "disagree[ing] . . . that a *quid pro quo* is not necessary for conviction under the Hobbs Act when an official receives a campaign contribution." *Id.* at 274. Noting that "[m]oney is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done," the Court held that the Hobbs Act permitted conviction for taking bribes in the form of contributions "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.* at 272-73.

One year after *McCormick*, the Supreme Court decided *Evans*, which applied the *McCormick* standard in another Hobbs Act case involving campaign contributions. As relevant here, the Court considered a jury instruction stating that, "if a public official demands or accepts money *in exchange for* a specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the Hobbs Act regardless of whether the payment is made in the form of a campaign contribution." 504 U.S. at 257-58 (emphasis added). The Court approved that instruction, concluding that it "satisfie[d] the *quid pro quo* requirement of *McCormick* because the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts." *Id.* at 268. Justice Kennedy emphasized in a concurring opinion that *McCormick* did not require

15

parties arranging a bribe to "state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods," affirming that "a *quid pro quo* with the attendant corrupt motive can be inferred from an ongoing course of conduct." *Id.* at 274. Thus, Justice Kennedy explained, an official's conduct "is criminal if it is express or if it is implied from his words and actions, so long as he intends it be so and the payor so interprets it," consistent with the principle that the "[t]he criminal law in the usual course concerns itself with motives and consequences, not formalities." *Id.*

Although *McCormick* and *Evans* concerned charges of extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951, courts have consistently applied their holdings to other federal crimes involving bribery of public officials, as the parties and the District Court did here. (*See* A. 31 n.4 (collecting cases)).

## B.   Discussion

### 1.   *McCormick* Does Not Require an Express *Quid Pro Quo*

The Indictment sufficiently alleged a *quid pro quo* under *McCormick*. The Supreme Court has held that the following jury instruction "satisfies the *quid pro quo* requirement of *McCormick*":

> [I]f a public official demands or accepts money *in exchange for* a specific requested exercise of his or her official power, such a demand or acceptance does

16

> constitute a violation of the Hobbs Act re-
> gardless of whether the payment is made
> in the form of a campaign contribution."

*Evans*, 504 U.S. at 258, 268 (emphasis added). That is exactly what the Indictment in this case alleged: that Benjamin demanded and accepted campaign contributions from Migdol "in exchange for" Benjamin's exercise of his official power to allocate a $50,000 grant of state funds. (A. 1, 19). The Indictment therefore satisfies the *quid pro quo* requirement of *McCormick*.

The District Court, however, held that even agreements to exchange campaign contributions for state action that are "clear and unambiguous to the parties themselves" fail to violate federal bribery laws unless those agreements are expressly stated. (A. 42). This conclusion has been rejected by every circuit to consider it. *United States v. Allinson*, 27 F.4th 913, 925 (3d Cir.) (approving jury instruction that "[t]he explicitness requirement does not require an official's specific statement that he will exchange official action for a contribution, but rather requires that the quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain."), *cert. denied*, 143 S. Ct. 427 (2022); *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) ("Much of Blagojevich's appellate presentation assumes that extortion can violate the Hobbs Act only if a *quid pro quo* is demanded explicitly, but the statute does not have a magic-words requirement."), *cert. denied*, 577 U.S. 1234 (2016); *United States v. Terry*, 707 F.3d 607, 612-13 (6th Cir. 2013) ("So long as a public official agrees that payments will influence an official act, that suffices. What

17

is needed is an agreement, full stop, which can be formal or informal, written or oral."), *cert. denied,* 571 U.S. 1237 (2014); *United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011) ("Since the [bribery] agreement is for some specific action or inaction, the agreement must be *explicit,* but there is no requirement that it be *express*."), *cert. denied,* 566 U.S. 1043 (2012); *United States v. Tomblin*, 46 F.3d 1369, 1381 (5th Cir. 1995) ("The explicitness requirement is satisfied so long as the terms of the quid pro quo are clear and unambiguous."); *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir.) ("This understanding need not be verbally explicit. The jury may consider both direct and circumstantial evidence . . . . As we read *McCormick,* the explicitness requirement is satisfied so long as the terms of the *quid pro quo* are clear and unambiguous."), *cert. denied,* 506 U.S. 919 (1992); *see also United States v. Correia*, 55 F.4th 12, 24-25, 30-31 (1st Cir. 2022) (rejecting sufficiency-of-the-evidence challenge to campaign contributions bribery conviction based on *quid pro quo* formed without express statement and shown by inferences).

The key point underlying these consistent decisions is straightforward: "Explicit, as explained in *Evans*, speaks not to the form of the agreement between the payor and payee, but to the degree to which the payor and payee were aware of its terms, regardless of whether those terms were articulated." *United States v. Blandford*, 33 F.3d 685, 696 (6th Cir. 1994). In other words, as the above cases explain, an explicit agreement is one that is unambiguously understood by the parties because it involves a clear and specific exchange of official action for campaign contributions.

18

Such a bribe violates federal law even if the politician is careful enough never to expressly say he is entering into a corrupt agreement, "for otherwise the law's effect could be frustrated by knowing winks and nods," *Evans*, 504 U.S. at 274 (Kennedy, J., concurring); *see also, e.g.*, *Allinson*, 27 F.4th at 925; *Siegelman*, 640 F.3d at 1171; *Carpenter*, 961 F.2d at 827.

Although *Evans* leaves no doubt that a bribery agreement need not be express to be criminal, even casting *Evans* aside—as the District Court did—would not alter this common-sense rule. Focusing on *McCormick* alone results in the same conclusion. The *McCormick* Court's concern was that the jury had been instructed that it could convict a politician who received campaign contributions without finding any *quid pro quo* at all. 500 U.S. at 274 ("We thus disagree with the Court of Appeals' holding in this case that a *quid pro quo* is not necessary for conviction . . . . By the same token, we hold . . . that the District Court's instruction to the same effect was error."). The Court found this problematic because contributions are often made to candidates that donors believe will take actions they favor. *See id.* at 272. Treating those circumstances as bribery "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation." *Id.* at 273. The Court resolved that concern by allowing conviction only for an "an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.* That promise must be "explicit" in the sense that it

involves not merely a general belief that the candidate will act in ways favorable to the donor, but a specific agreement that "his official conduct will be controlled by the terms of the promise or undertaking." *Id.* Demanding that clarity ensures that only true bribes, and not routine fundraising, will be subject to criminal prosecution—regardless of whether such bribes are agreed to "expressly" or through the far more common "winks and nods" that nonetheless leave the bargain clear in the minds of the parties.

Consistent with that reasoning, *McCormick* endorsed the jury instructions in *United States v. Dozier*, 672 F.2d 531 (5th Cir. 1982). *See McCormick*, 500 U.S. at 273. Those instructions stated that the law punishes "those who, under the guise of requesting 'donations,' demand money in return for some act of official grace." *Dozier*, 672 F.2d at 537. Thus "demanding of specific contributions in return for specific actions" violates federal law. *Id.* at 538. Consistent with those principles, *Dozier* affirmed convictions where the defendant's "implication was clear" from the circumstances surrounding his solicitation of bribes, even though the defendant had "denied . . . that he was 'putting a fee' on his help." *Id.* In other words, at the same time that *McCormick* established the requirement of "an explicit promise or undertaking," it approved of a case in which the promise was never made "express," but rather established by clear implications. *See* 500 U.S. at 272-73.

Similarly, *McCormick* quoted with approval the following guidance from a Department of Justice manual: "Campaign contributions will not be authorized as the

20

subject of a Hobbs Act prosecution unless they can be proven to have been given in return for the performance of or abstaining from an official act; otherwise any campaign contribution might constitute a violation." 500 U.S. at 273. That guidance says nothing about how such an exchange can be proven. It does not, for example, suggest that the proof must be an express promise or forbid considering inferences from the parties' actions. *See id.* That is because ensuring the contribution was "given in return for the performance of or abstaining from an official act" suffices to accomplish *McCormick*'s purpose of shielding routine campaign finance from criminalization. *See id.* at 273.

Other circuits have thus had no trouble adopting the *Evans* interpretation of *McCormick* even without consulting *Evans* itself. In *Carpenter*, for example, the Ninth Circuit applied *McCormick* to bribery involving campaign contributions one month before *Evans* was decided. The Ninth Circuit rejected the defendant's argument "that the explicitness requirement cannot be met unless an official has specifically stated that he will exchange official action for a contribution." *Id.* at 827. Instead, the court explained that "what *McCormick* requires is that the quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain." *Id.* For that reason, juries "may consider both direct and circumstantial evidence . . . to determine if there was a meeting of the minds on a quid pro quo." *Id.* The court even observed that a contrary holding would allow the law to be defeated by "winks and nods," *id.*, foreshadowing Justice Kennedy's later use of the same phrase to explain the same principle in his *Evans* concurrence. More recently, the Seventh Circuit

21

explained that jury instructions allowing conviction in a campaign contribution bribery case based on a *quid pro quo* accomplished through, "Nudge, nudge, wink, wink, you know what I mean," "track[ed] *McCormick*" without ever citing *Evans*. *Blagojevich*, 794 F.3d at 738.

Appellate courts have so consistently rejected the District Court's approach in part because its immunization of wink-and-nod bribery runs contrary to the widely accepted principle that "[t]he criminal law in the usual course concerns itself with motives and consequences, not formalities." *Evans*, 504 U.S. at 274 (Kennedy, J., concurring). Consistent with that principle, the recognition that criminal agreements are often forged and proven through something less than express negotiations is found throughout this Court's cases. *See, e.g.*, *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) ("Conspiracies are secretive by their very nature, and it is thus well-settled that the elements of a conspiracy may be proved by circumstantial evidence."); *United States v. Cassino*, 467 F.2d 610, 619 (2d Cir. 1972) ("actions often speak louder than words and . . . a specific, tangible agreement in words is not necessary to establish the existence of a conspiracy").

The District Court departed from that basic principle of criminal law in rejecting the possibility that a *quid pro quo* could "be implied from the official's words and actions." (A. 40). "In any criminal case, after all, the factfinder can draw inferences about a defendant's intent based on all the facts and circumstances of a crime's commission." *Rosemond v. United States*, 572

U.S. 65, 78 n.9 (2014). Nowhere else does the criminal law recognize the District Court's rejection of circumstantial evidence. *See, e.g.*, *Holland v. United States*, 348 U.S. 121, 140 (1954) (holding circumstantial evidence proving guilt beyond a reasonable doubt is sufficient to convict); *United States v. Salameh*, 152 F.3d 88, 143 (2d Cir. 1998) (noting that "as a general rule most evidence of intent is circumstantial"); *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005) ("A verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability drawn from the circumstances are reasonable.").

There is little reason to depart from a uniform understanding of *McCormick*—the same understanding found in *Evans* and the decisions of at least six other circuits—that also comports with the criminal law's general treatment of criminal conspiracies. As this Court has long recognized, the "agreement or understanding element of bribery is indistinguishable from a conspiratorial agreement, and accordingly may be proven by circumstantial evidence." *Friedman*, 854 F.2d at 553. That "is especially true in cases involving governmental officials or political leaders, whose affairs tend more than most to be subjected to public scrutiny. As a result, a jury can in such cases infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt." *Id.* at 554; *see also United States v. Myers*, 692 F.2d 823, 843-44 (2d Cir. 1982) ("Undercover agents offering bribes to Congressmen are entitled to simulate the guarded conversation that would be expected of those proposing an unlawful venture.").

23

### 2. This Court's Precedent Does Not Require an Express *Quid Pro Quo*

In charting its own course, the District Court cast aside the most useful compass available: *Evans*. At the same time, however, the District Court acknowledged that the conviction in *Evans* involved campaign contributions. That is plainly correct. As the District Court noted, there was no dispute that at least part of the bribe in *Evans* was a campaign contribution, the jury instructions said that the defendant claimed the entire bribe was a contribution, and Justice Kennedy's concurrence described the case as one in which the bribe was paid in the form of a contribution. (*See* A. 33, 36). Moreover, the majority opinion in *Evans* never disagreed with Justice Kennedy's description of the case as concerning campaign contributions, the jury instructions challenged in *Evans* applied "regardless of whether the payment is made in the form of a campaign contribution," and those instructions were found "to satisfy the *quid pro quo* requirement of *McCormick*." *Evans*, 504 U.S. at 258, 268.

The District Court nevertheless believed it was required to ignore *Evans* based on language from this Court's opinions in *Garcia* and *Ganim*. (A. 35-38). Put another way, while acknowledging that "the Second Circuit has not yet had occasion to decide a case alleging bribery in the form of campaign contributions," the District Court nonetheless felt bound by language in cases that did not apply *McCormick*. (A. 35).

In *Garcia*, a former congressman was convicted of taking bribes in the form of cash payments, donations to a family member's church, jewelry, and an interest-

24

free loan. *See* 992 F.2d at 410-12. This Court reversed because the jury had been instructed that it could convict without finding any *quid pro quo* at all—something *Evans* required. *Id.* at 410-14. Along the way to that holding, *Garcia* stated that *McCormick* had required "an explicit promise or undertaking by the official to perform or not to perform an official act" in "circumstances involving campaign contributions," and that *Evans* had "modified this standard in non-campaign contribution cases." *Id.* at 414.

*Garcia* contains little to commend the District Court's ruling. There is no dispute that in campaign contribution cases such as this one the Government must prove an explicit *quid pro quo*. The legion of courts rejecting the District Court's approach all accept that; they simply recognize that an explicit bargain is one whose terms are specific and unambiguous. (*See supra* at 16-17). Moreover, because *Garcia* never offered any definition of "explicit," nothing in that case supports the District Court's decision to define that word as requiring an express agreement impervious to proof by circumstantial evidence, regardless of its clarity.

*Ganim* involved a former mayor convicted of receiving bribes in the form of "money and benefits such as wine, cabinets, home improvements and meals"—again, not campaign contributions. 510 F.3d at 136, 138-39. On appeal, the defendant argued that "proof of a government official's promise to perform a future, but unspecified, official act" was "[in]sufficient to demonstrate the requisite *quid pro quo* for a conviction." *Id.* at 141-42. This Court affirmed his

25

convictions, holding "that the requisite *quid pro quo* . . . may be satisfied upon a showing that a government official received a benefit in exchange for his promise to perform official acts or to perform such acts as the opportunities arise." *Id.* at 142. Like *Garcia*, this holding does little to support the District Court's reasoning, because it does not arise in a contribution case and does not apply *McCormick*.

Instead, the District Court focused on the opinion's background section describing prior cases. There, *Ganim* briefly summarized *McCormick*, quoting its "explicit promise or undertaking" requirement. *Ganim*, 510 F.3d at 142. But in continuing its description, *Ganim* paraphrased that requirement, saying that "proof of an *express* promise is necessary when the payments are made in the form of campaign contributions." *Ganim*, 510 F.3d at 142 (emphasis added). No analysis accompanied that rephrasing, and the opinion gives no hint that the Court intended to convey anything by it. *See id.* Next, *Ganim* described *Evans*—correctly, in the Government's view—as having "found that the jury instruction, which allowed for a conviction if the official accepted money 'in exchange for a specific requested exercise of his or her official power,' satisfied *McCormick*'s quid pro quo requirement." *Id.* at 142-43. And then *Ganim* stated that *Garcia* had "harmonized" *Evans* and *McCormick* by discerning that *Evans* "modified" *McCormick* "in non-campaign contribution cases." *Ganim*, 510 F.3d at 143.

The District Court believed this summary of the law compelled its conclusions that *Evans* has no bearing in campaign contribution cases and that an explicit

26

*quid pro quo* is one that must be expressly stated by the parties. (A. 35-41). But *Garcia* and *Ganim* do not support—much less require—such a departure from this Court's general approach to circumstantial evidence, or the uniform holdings of other circuits on the meaning of "explicit" in *McCormick*, for at least three reasons.

*First*, the statements on which the District Court relied were dicta, and thus "cannot be binding . . . no matter how strong or how characterized." *Jimenez v. Walker*, 458 F.3d 130, 142 (2d Cir. 2006). *Garcia* and *Ganim* did not concern campaign contributions or apply *McCormick*, and so any statement they made about the standard applicable to campaign contributions was "not essential to the decision." *Id.* (finding language in two of this Court's prior decisions to be dicta).

The District Court suggested that "[t]o articulate the standard for non-contribution cases, the court necessarily had to explain the standard in place for contribution cases" and so the two cases' "rulings on the standard for contribution cases can therefore be understood as reasoning necessary to reach their holdings, and thus not dicta." (A. 38). But it is hard to see why that would be so. Because *Ganim* and *Garcia* held that *McCormick*'s "explicit promise or undertaking" requirement did not apply to the cases at hand, nothing they said about that requirement could have affected their outcome. *See Jimenez*, 458 F.3d at 142-43 ("If a point of law might have been decided either way without affecting any right brought into question, then, according to the principles of the common law, an opinion on such a question is not a decision."). Both cases thus

27

described *McCormick* only briefly, and in the process of brushing it aside in order to get to matters essential to their decision. *See Ganim*, 510 F.3d at 143; *Garcia*, 992 F.2d at 414. The District Court recognized as much, lamenting elsewhere in its opinion that "the Second Circuit has unfortunately not supplied a clear definition of 'explicit.'" (A. 39).

Similarly, whether *Evans* applies in campaign contribution cases had no effect on *Ganim* and *Garcia*, because they were not contribution cases. The reasoning that drove those decisions was that *Evans* applied to them and *McCormick* did not. *See Ganim*, 510 F.3d at 136, 138-39; *Garcia*, 992 F.2d at 410-14. This Court thus remains free to follow the other circuits that have concluded that *Evans* applies in campaign contribution cases because it quite obviously concerned campaign contribution bribery. *See, e.g., Terry*, 707 F.3d at 612-13; *Siegelman*, 640 F.3d at 1171; *United States v. Davis*, 841 F. App'x 375, 379 (3d Cir. 2021), *cert. denied,* 142 S. Ct. 401 (2021).

*Second*, the relevant references in *Ganim* and *Garcia* did not constitute the type of dicta that lower courts should follow even if not binding. "Dicta deserve close consideration; emphatic dicta, all the more." *Jimenez*, 458 F.3d at 142. But this Court has distinguished between "'obiter dictum' which constitutes an aside or an unnecessary extension of comment," and "considered or 'judicial dictum' where the Court . . . is providing a construction of a statute to guide the future conduct of inferior courts." *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975).

28

The statements here more closely resemble the former. By the time *Ganim* was decided, at least two circuits had held—in reasoned opinions where the standard applicable to campaign contribution bribery was at issue—that requiring an explicit *quid pro quo* did not mean requiring an express *quid pro quo*. *See Tomblin*, 46 F.3d at 1381; *Carpenter,* 961 F.2d at 827. Moreover, this Court had its own precedents making clear that criminal agreements, including bribery agreements, need not be spoken aloud "especially . . . in cases involving governmental officials or political leaders." *Friedman*, 854 F.2d at 553. It is unlikely, at best, that this Court intended lower courts to cast all that aside based on a few sentences in opinions on a different subject.

The District Court nonetheless held that the statements in *Ganim* and *Garcia* "are the type of dicta that should be given great weight by district courts in the Second Circuit." (A. 38). But the case on which it relied illustrates the opposite. *See United States v. Oshatz*, 912 F.2d 534 (2d Cir. 1990). *Oshatz* acknowledged that "not every observation contained in an opinion of this Court deserves to be regarded as the law of this Circuit." *Id.* at 540. This Court thus explained why the particular dicta at issue there commanded obedience. The prosecution in *Oshatz* had conducted a form of cross-examination that a prior panel of this Court had condemned in dicta. *Id.* But it was dicta only because the improper cross-examination had not risen to the level of reversible error. *Id.* The *Oshatz* panel explained that dicta concerning "an aspect of trial procedure . . . likely to recur with frequency" should be followed, so that this Court can provide guidance without

29

needing to reverse for every trial error just to ensure that its guidance is followed. *Id.* at 540-41. Moreover, before embarking on this analysis, the Court reviewed the opinions of other circuits, finding near uniform agreement with the substance of the dicta at issue. *Id.* at 539-40. That approach stands in stark contrast to the District Court's approach here, which relied on dicta to (*i*) create a new substantive element on a question fully amenable to binding review by this Court following a conviction; and (*ii*) reject the uniform opinion of other circuits on a question the District Court acknowledged this Court has never decided.

*Third*, even with respect to binding holdings, "the language of an opinion is not always to be parsed as though . . . dealing with the language of a statute." *Brown v. Davenport*, 142 S. Ct. 1510, 1528 (2022). Here, *Ganim*'s substitution of "express" for "explicit" cannot reasonably be seen as a one-word command to impose the sort of magic words requirement this Court often rejects, and which other circuits have rejected reading into *McCormick*. *See, e.g., United States v. Bahel*, 662 F.3d 610, 635 (2d Cir. 2011); *Blagojevich*, 794 F.3d at 738.

Instead, the District Court should have looked to the overall reasoning and holding of *Ganim* and its progeny. In *Ganim*, this Court rejected the defendant's argument that the bribes he received—which, again, were not campaign contributions—"must be directly linked to a particular act at the time of agreement." *Ganim*, 510 F.3d at 145. In doing so, *Ganim* reaffirmed what is often called the "as opportunities arise" theory, where a particular payment is exchanged for a

30

commitment to perform unspecified official acts in the future. *See, e.g.*, *United States v. Silver*, 948 F.3d 538, 566 & n.15 (2d Cir. 2020); *United States v. Rosen*, 716 F.3d 691, 701 (2d Cir. 2013); *United States v. Coyne*, 4 F.3d 100, 111 (2d Cir. 1993). In particular, *Ganim* focused on whether the jury instructions required "a sufficiently specific nexus" under that theory. 510 F.3d at 142, 152. And that focus explains the bifurcation of *McCormick* and *Evans* in *Ganim* and *Garcia* far better than the District Court's belief that this Court wished to banish *Evans* from contribution cases.

*Garcia* quoted *McCormick*'s requirement that "payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act," and explained that the trial court had no obligation to provide such an instruction, because *Garcia* did not concern contributions. *Garcia*, 992 F.2d at 414. Later that year, this Court affirmed the "as opportunities arise" theory in another non-contribution case, changing the language slightly and stating that *Garcia* held "that the government does not have to prove an explicit promise to perform *a particular act* made at the time of payment." *Coyne*, 4 F.3d at 114 (emphasis added).

By the time *Ganim* arrived, prior opinions thus suggested a dichotomy: non-contribution cases premised on an "as opportunities arise" theory, and other cases requiring "an explicit promise to perform a particular act"—a formulation that sounds much like (although does not in fact mirror) *McCormick*. *See Ganim*, 510 F.3d at 143-44 (discussing *Garcia* and *Coyne*). In future cases—again, none concerning

31

campaign contributions—this Court would repeat *Ganim*'s summary of the law in contrasting the "as opportunities arise" theory with the "the unique context of campaign contributions," importing *Ganim*'s use of "express" where *McCormick* had said "explicit." *See Rosen*, 716 F.3d at 701; *Silver*, 948 F.3d at 568.

Thus, to the extent the dicta concerning "express" promises and the application of *Evans* to campaign contribution cases have any import, they do not suggest this Court has rejected the otherwise undisputed view that *McCormick*'s "explicitness requirement is satisfied so long as the terms of the *quid pro quo* are clear and unambiguous." *Carpenter*, 961 F.2d at 827. Instead, they signify—at most—this Court's clarification that whatever an "explicit promise" requires, it does not restrict the "as opportunities arise" theory outside "the special context of political contributions." *Silver*, 948 at 538. Put another way, *Ganim* did not concern what the Government needed to prove in a campaign contributions case, but what the Government "need *not* show" in an "as opportunities arise" case. *Bahel*, 662 F.3d at 635.

The District Court found this "plausible" understanding of *Ganim* and *Garcia* to have "some force," but ultimately rejected it. (A. 43). It noted that "*McCormick* itself involved a particular *quid* for a particular *quo*." (A. 43). From that, the District Court reasoned that if "an exact exchange between a specific quid and a specific quo . . . is all that is necessary to make a *quid pro quo* 'explicit,' then the Supreme Court would have affirmed the conviction rather than reversing" in *McCormick*. (A. 43). That inference does not

32

follow, however, because it depends on a misunderstanding of the issue in *McCormick*. *McCormick* concerned a challenge to jury instructions, not the sufficiency of the evidence. The Court thus did not hold that the facts failed to demonstrate a sufficiently explicit *quid pro quo*, but rather that the instructions failed to tell the jury that it needed to find any *quid pro quo* at all—explicit or otherwise. 500 U.S. at 274 ("We thus disagree with the Court of Appeals' holding in this case that a *quid pro quo* is not necessary for conviction . . . . By the same token, we hold . . . that the District Court's instruction to the same effect was error."). The facts of *McCormick* therefore do not suggest that properly instructed juries cannot find a clear but unspoken exchange "of a particular *quid* for a particular *quo*" sufficiently explicit, which is why so many other courts have held that they can.

The District Court also noted that a bargain to exchange campaign contributions for official acts as opportunities arise could be clear and unambiguous. (A. 43). Whether or not that might be true in a different case, it is irrelevant here given the Indictment's allegations of a direct exchange of contributions for one specific official act: the grant of $50,000 in state funds to FPSH. And even if true, it would not cast doubt on the observation that, in the contribution context, *Ganim* and *Garcia* serve only to segregate *McCormick* from "as opportunities arise" cases.[4] The panels in

———————

[4] Given the specificity of the *quid pro quo* between Benjamin and Migdol, this case does not require determining whether an agreement to perform specific

33

*Ganim* and *Garcia* could have examined—in further dicta—whether an unambiguous agreement to perform corrupt acts as opportunities arise in return for contributions might satisfy *McCormick*. But instead they took the simpler path of explaining that *McCormick* had no bearing in their cases. That is why their brief language suggesting what scope *McCormick* might have in other cases is dicta.

### 3. The District Court's Reasoning Does Not Support an Express *Quid Pro Quo* Requirement

In addition to the dicta in *Ganim* and *Garcia*, the District Court advanced several secondary reasons in support of its construction of *McCormick*. None, whether taken separately or together, supports its novel interpretation.

The District Court suggested that "the best evidence of the meaning of *McCormick*'s 'explicit' *quid pro quo* comes from the facts of *McCormick* itself" because "the Court reversed the conviction for lack of a sufficiently 'explicit' *quid pro quo*." (A. 41-42). That is incorrect. As just discussed, *McCormick* concerned jury instructions, not sufficiency of the evidence, and the Court reversed because the jury was not instructed

─────────

but contingent acts as opportunities arise could be sufficiently clear to satisfy *McCormick*. *Cf. Terry*, 707 F.3d at 614 ("Whatever else *McCormick* may mean, it does not give an elected judge the First Amendment right to sell a case so long as the buyer has not picked out *which* case at the time of sale.").

34

that it had to find a *quid pro quo* to convict. *See McCormick*, 500 U.S. at 274; *see also id.* at 261 n.4 (jury was instructed that "it is not necessary that the government prove that the defendant committed or promised to commit a quid pro quo"); *United States v. Taylor*, 966 F.2d 830, 832 (4th Cir. 1992) ("The Supreme Court reversed McCormick's conviction because it found that the jury instructions did not properly inform the jury . . . .").

In fact, *McCormick* chastised the Fourth Circuit for discussing the sufficiency of the evidence, rather than focusing on the jury instructions that formed the issue on appeal. *See* 500 U.S. at 269-70. And this Court has apparently read the facts in *McCormick* to reflect the express promise that the District Court asserted must be absent. *See Silver*, 948 F.3d at 548 ("Unlike in *McCormick*, the *Evans* defendant-official had never expressly promised to take official action."). The facts of *McCormick* thus provide no support for the District Court's construction of its explicit promise requirement, because *McCormick* does not say whether a properly instructed jury could have convicted on those facts.

The District Court also offered various reasons to disregard *Evans*, despite acknowledging that *Evans* involved campaign contributions. It suggested "the majority opinion . . . largely focuse[d] on the $7000 cash payment, which, according to the jury's findings, was *not* a campaign contribution." (A. 37 (citing the circuit's decision, *United States v. Evans*, 910 F.2d 790, 798 n.10 (11th Cir. 1990))). The *Evans* Court also, however, directly addressed and applied *McCormick*. Not

35

only did it repeatedly cite *McCormick*, but the Court explained that: (*i*) Evans had argued the $7,000 was a contribution, (*ii*) another $1,000 in bribes was indisputably a contribution, (*iii*) the jury was told that Evans contended the entire $8,000 was a contribution, and (*iv*) the jury instruction stated that it applied "regardless of whether the payment is made in the form of a campaign contribution." 504 U.S. at 257-58.

The District Court next stated that the Court "granted certiorari in *Evans* to resolve an issue orthogonal to the question of the *quid pro quo* standard for bribes involving campaign contributions, and the majority did not purport to overrule or alter the standard in *McCormick* for campaign contribution cases." (A. 37). Both statements are accurate, but neither supports the District Court's ruling. Although *Evans* focused on whether an official had to induce a bribe, the defendant also raised whether the *quid pro quo* standard of *McCormick* was satisfied. *See, e.g.*, *Evans v. United States*, 1991 WL 527604 at \*45-47 (U.S. Pet. Brief, 1991). It is because the defendant raised that issue that *Evans* discussed and ruled on the *quid pro quo* standard—which, in turn, is why the District Court's ruling depends on distinguishing *Evans* in the first place. And although *Evans* did not purport to modify *McCormick*, that only reinforces the point that even standing alone *McCormick* supports the Government's understanding of an explicit *quid pro quo*. *Evans* simply made that clear beyond doubt. (*See supra* at 18-20 (citing *McCormick*, 500 U.S. at 272-73; *Dozier*, 672 F.2d at 537-38; *Carpenter*, 961 F.3d at 827; *Blagojevich*, 794 F.3d at 738)).

36

In support of equating "explicit" with "express," the District Court suggested that the two words are essentially synonymous. (A. 39 & n.6). There are circumstances where the words can be used interchangeably, which is likely why *Ganim* swapped the latter for the former without any accompanying reasoning. "Explicit, however, does not mean express." *Siegelman*, 640 F.3d at 1171. The distinction between the two words is important here: "'Explicit' . . . means 'not obscure or ambiguous, having no disguised meaning or reservation,' or '[c]lear in understanding,'" whereas "'[e]xpress' refers to something that is 'declared in terms; set forth in words and not left to inference.'" *Blandford*, 33 F.3d at 696 n.13 (quoting BLACK'S LAW DICTIONARY 579, 580 (6th ed. 1990)).[5] Thus, an express *quid pro quo* must be put into words—or else it has not been expressed—whereas an explicit *quid pro quo* must have clear and unambiguous terms requiring the exchange of campaign contributions for official acts, "regardless of whether those terms were articulated." *Blandford*, 33 F.3d at 696; *accord Terry*, 707 F.3d at 612-13; *Siegelman*, 640 F.3d at 1171; *Tomblin*, 46 F.3d at 1381; *Carpenter*, 961 F.2d at 827; *Davis*, 841 F.

---

[5]   The District Court cited a different edition, but its quotations reflect similar distinctions. (*See* A. 41 (citing BLACK'S LAW DICTIONARY (11th ed. 2019), and defining "explicit" as "[c]lear, open, direct, or exact" or "[e]xpressed without ambiguity or vagueness; leaving no doubt," but "express" as "[c]learly and unmistakably *communicated*" or "*stated* with directness and clarity" (emphasis added)).

37

App'x at 379 ("Davis asserts that the words "express" and "explicit" mean the same thing, but he is incorrect. . . . [W]hether based on direct or circumstantial evidence, the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.").

The District Court resisted this conclusion on the ground that there would have been "little or no reason for Justice Stevens to have dissented in *McCormick*" if that decision permitted conviction for agreements "based on unspoken assumptions, winks and nods—so long as the terms of the bargain were clear and unambiguous to the parties themselves." (A. 42). But Justice Stevens' dissent focused on his belief that McCormick had forfeited his challenge to the jury instructions and that any flaws in those instructions were harmless. *See* 500 U.S. at 280-90. In the single paragraph invoked by the District Court, Justice Stevens also stated that "[a]s I understand its opinion" the Court "seems" to require an "express understanding" of the bribe. *Id.* at 282. Those mild words hardly define *McCormick*'s standard, especially given that dissents may exaggerate potential problems with majority opinions more to criticize them than to elucidate their holdings. *See, e.g.*, *Magwood v. Patterson*, 561 U.S. 320, 340 (2010). And even if the dissent's language were to be parsed like a statute, an "express *understanding*" is not necessarily an agreement reached in express *words*, because an understanding exists in the mind—exactly where Justice Stevens believed the jury must find the requisite *quid pro quo* exists. *Cf.*

*Carpenter*, 961 F.2d at 827 ("This understanding need not be *verbally* explicit." (emphasis added)).

The District Court also observed that a *quid pro quo* agreement cannot "be simultaneously 'explicit' and 'implicit.'" (A. 40). That linguistically correct statement conflates two different legal questions: The terms of the agreement and the means the parties use to reach it. The terms of an agreement must be explicit, such that the official has clearly and unambiguously agreed "to perform or not to perform an official act" in exchange for a contribution. *McCormick*, 500 U.S. at 273. But the parties can negotiate those terms in any way—through words, but also through gestures and actions—so long as they achieve the requisite clarity. *E.g.*, *Carpenter*, 961 F.2d at 827; *Friedman*, 854 F.2d at 553. As with every other criminal agreement, the relevant understanding must exist in the minds of the conspirators. That means it can only be established inferentially, which is why *McCormick* reaffirmed that "matters of intent are for the jury to consider." 500 U.S. at 270. How an agreement was formed is simply a matter of proof, as is true "[i]n any criminal case." *Rosemond*, 572 U.S. at 78 n.9.

Through five hypothetical examples, the District Court sought to demonstrate that requiring an express *quid pro quo* would not require bribery agreements to be "stated or transcribed." (A. 44-45). But its examples show the opposite. The District Court believed that only two of its examples reflect a sufficiently explicit *quid pro quo*. In both, the *quid pro quo* is expressly stated, with a mayor telling a businesswoman "that he will award her company a contract if she donates

39

$5,000 to his campaign." (A. 44).[6] That is the type of scenario that other courts, including this one, have imagined only to illustrate the implausibility of requiring an express agreement. *See Blagojevich*, 794 F.3d at 738 ("Few politicians say, on or off the record, 'I will exchange official act X for payment Y.'"); *United States v. Inzunza*, 638 F.3d 1006, 1014 (9th Cir. 2011) ("An official may be convicted without evidence equivalent to a statement such as: 'Thank you for the $10,000 campaign contribution. In return for it, I promise to introduce your bill tomorrow.'"); *Myers*, 692 F.2d at 844 (undercover agents offering bribe need not say "Congressman, I have here a cash bribe to be exchanged for your corrupt promise to be influenced in your official action.").[7]

The First Amendment also does not buttress the District Court's ruling. The District Court correctly noted that campaign contributions implicate core First

---

[6]  The only difference in the examples is that in one the businesswoman accepts the expressly-stated offer to commit bribery in words, and in the other she accepts the expressly-stated offer by smiling, shaking the mayor's hand, and giving him a $5,000 check. (A. 44).

[7]  That is not to say that the Government believes the District Court's other three examples, consisting of three to five sentence sketches, necessarily suffice to infer a *quid pro quo*. (*See* A. 45). But any federal bribery case—including this one—entails far more than a paragraph's worth of evidence.

40

Amendment concerns. (A. 47). But it was also correct to acknowledge that *McCormick* was driven by those concerns. (A. 47-48). Thus, if the Indictment satisfies *McCormick*—which, for all the above reasons, it does —then the relevant First Amendment concerns have already been addressed. That makes sense, because Benjamin does not have a colorable First Amendment right to give Migdol state funds so that Migdol can give Benjamin contributions in return. *See, e.g.*, *United States v. Halloran*, 821 F.3d 321, 340 (2d Cir. 2016) (explaining that the Supreme Court has not "h[e]ld that the First Amendment protects bribery," recognizing instead "the government's interest in preventing *quid pro quo* corruption or the appearance thereof"); *United States v. Pawlowski*, 27 F.4th 897, 902-03 (3d Cir.) ("The public has an interest in ensuring its representatives are held accountable for abusing the public trust, even when that abuse occurs in the campaign-finance context."), *cert. denied*, 143 S. Ct. 302 (2022).

For similar reasons, the Due Process Clause offers no support to the District Court's decision. Benjamin was fully on notice that his conduct was illegal, because "'it has always been as plain as a pikestaff that bribes and kickbacks' are prohibited." *Rosen*, 716 F.3d at 700 (quoting *Skilling v. United States*, 561 U.S. 358, 411 (2010)); *see also United States v. Brewster*, 408 U.S. 501, 526 (1972) ("Taking a bribe is, obviously, no part of the legislative process or function. It is not, by any conceivable interpretation, an act performed as a part of or even incidental to the role of a legislator.").

The District Court cited "the principle that 'due process bars courts from applying a novel construction

of a criminal statute to conduct that neither the stat-ute nor any prior judicial decision has fairly disclosed to be within its scope.'" (A. 49 (quoting *United States v. Lanier*, 520 U.S. 259, 266 (1997))). But the only novel construction at issue here originated with the District Court. As discussed throughout, many courts had addressed the *McCormick* standard before Benja-min solicited Migdol, and the Government is aware of none that required an express agreement to commit bribery.[8] Prior judicial decisions thus fairly disclosed Benjamin's conduct to be criminal, which is likely why he took so many steps—including committing more crimes—to conceal it (A. 12-15). *See United States v. Moseley*, 980 F.3d 9, 24 (2d Cir. 2020) (finding no due process concern "when the law gives sufficient warning that people may conduct themselves so as to avoid that which is forbidden, and thus does not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope.").

---

[8]  In addition to the phalanx of circuit courts at odds with its decision, the District Court discussed *United States v. McGregor*, 879 F. Supp. 2d 1308 (M.D. Ala. 2012). In *McGregor*, the court explained the bases for its jury instructions, including that "[f]or a quid prop quo agreement, this court required only a speci-ficity showing because agreements are, by definition, explicit," and rejected the argument that the agree-ment need be express, per the Eleventh Circuit's hold-ing in *Siegelman. Id.* at 1319.

42

Nor do the *Ganim* and *Garcia* dicta create a due process concern. (*See* A. 49). Even if those dicta were holdings that created an actual split of authority on this question—which, as discussed above, they did not—a division of judicial authority does not defeat fair notice. Otherwise, the constant and inevitable variations among court decisions would bar prosecution under many federal statutes at any given time. The question is whether "any prior judicial decision" gave a defendant notice that he might be prosecuted, not whether any decision gave him hope that he might not be. *Lanier*, 520 U.S. at 266; *cf. id* at 271 ("[D]ue process requirements are not designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited").

### 4. The Bribery Counts Are Sufficiently Pled

If this Court rejects the District Court's interpretation of *McCormick*, then it should reverse its dismissal of the bribery counts and remand for trial. Both grounds the District Court gave for dismissing those counts depend on its interpretation of the explicit *quid pro quo* requirement. (*See* A. 52 (acknowledging that Indictment adequately pleaded *quid pro quo* if "inferences drawn from Benjamin's course of conduct" could be considered as they would be under cases such as *Evans* and *Blandford*); A. 55-56 (Indictment would adequately plead connection between agreement and Benjamin's official acts if inferences could be considered)). But even if the District Court's interpretation

43

of the *McCormick* standard had merit, it still erred in dismissing the bribery counts before a trial revealed whether the evidence would meet that standard.

### a. The Bribery Counts Sufficiently Allege a *Quid Pro Quo*

The District Court held that the bribery counts failed to adequately plead the *quid pro quo* element of bribery. But the Indictment twice alleged that Benjamin sought and received campaign contributions in exchange for the $50,000 grant to FPSH—once in its first paragraph, describing the overall scheme, and again in Count Three. (A. 1, 18). That first paragraph was incorporated by reference into Counts One, Two, and Three, meaning that all the bribery counts contained the "in exchange for" allegation. (*See* A. 15, 17). The Government is aware of no court that has previously found that alleging money was exchanged for official action fails to plead bribery. *Cf. United States v. Ng Lap Seng*, 934 F.3d 110, 118 n.4 (2d Cir. 2019) (making otherwise lawful, voluntary contributions to President of the United Nations "*in exchange for* a statutorily proscribed *quid pro quo* can constitute unlawful bribery" (citing, among other cases, *McCormick*)); *Blandford*, 33 F.3d at 694 ("What the Hobbs Act proscribes is the taking of money by a public official in exchange for *specific* promises to do or refrain from doing *specific* things. In other words, there must be a *quid pro quo*.").[9]

---

[9] The Government has not located any appellate case discussing the pleading standard for a *quid pro*

44

The District Court, however, asserted that "an explicit or express promise . . . constitutes an essential element of the crime," and so must be specifically pled. (A. 50). For this proposition, the District Court cited *United States v. Donagher*, 520 F. Supp. 3d 1034 (N.D. Ill. 2021). But even assuming *Donagher* was correctly decided, the Indictment would satisfy it. That case agreed with the District Court that an "explicit *quid pro quo*" forms an implicit element of the charges here, and so must be pled. *Id.* at 1045. But it listed "in exchange for" as among the phrases that would "supply the required element." *Id.* In *Donagher*, the problem— similar to the jury instructions in *McCormick*—was that the indictment did not allege a *quid pro quo* at all. *Id.* Because here the Indictment does allege an exchange of campaign contributions for official acts (and

_____

*quo* under *McCormick*. The cases in this area typically review jury instructions—as in *McCormick* and *Evans* —or sufficiency of the evidence. *See, e.g., Terry*, 707 F.3d at 612 (instructions); *Blandford*, 33 F.3d at 694 (instructions); *Carpenter*, 961 F.2d at 827 (instructions); *Pawlowski*, 27 F.4th at 903 (sufficiency); *Davis*, 841 F. App'x at 380 (sufficiency). That only further illustrates the District Court's error. If jury instructions, which are typically far more detailed than indictments, suffice to inform a jury of the legal requirements for conviction without describing the District Court's heightened standard for a *quid pro quo*, then *a fortiori* the Indictment "contains the elements of the offense charged." *Hamling v. United States*, 418 U.S. 87, 117 (1974).

45

a very specific one at that), it would suffice under *Donagher*, as it would under every other case the Government has located.

For example, this Court explained that even though not found in the statute, a knowledge requirement is implicit in 18 U.S.C. § 924(c). *United States v. Santeramo*, 45 F.3d 622, 623 (2d Cir. 1995). But it further explained that although this knowledge requirement was an element of the crime, it need not be "alleged expressly in the indictment." *Id.* at 624. Instead, knowledge was implicit in the indictment's allegation that the firearm was used during and in relation to a drug crime, because it would be difficult to use a firearm without knowing about it. *Id.* Thus, the indictment gave the defendant "sufficient information about the core criminal conduct for which he was charged to allow him to defend against the charges." *Id.* So too here. Although the Indictment does not literally say that Benjamin engaged in an "explicit *quid pro quo*," its allegations that he demanded, agreed to exchange, and exchanged specified state action for specified campaign contributions adequately informs him of the charges against him.[10]

––––––––––

[10] *Santeramo* is also relevant to the District Court's reliance on the discussion of judicially-created implicit elements in WAYNE LAFAVE *et al.*, 5 CRIM. PROC. § 19.3(b) (4th ed.) (2021). (*See* A. 30 n.3, 50). As LAFAVE explains, courts vary in the degree to which they require such requirements to be pled, listing this Court as among those that "tend to view quite narrowly settings in which the judicial interpretation of a

46

In any event, "explicitness" or "expressness" is not an element of federal bribery offenses. The existence of a *quid pro quo* is itself an implied element not found in the relevant statutes, but created in cases such as *McCormick*. And in this Circuit, even that universally recognized requirement for conviction need not be pled in any particular formula. *See, e.g.*, *United States v. Seminerio*, 2010 WL 3341887, at *6 (S.D.N.Y. Aug. 20, 2010) (indictment "need not utter the 'magic words' '*quid pro quo*' or even 'bribe' or 'bribe receiving'"). It follows that "how 'specific,' 'express' or 'explicit' a *quid pro quo* must be" does "not add a new element" to federal bribery laws, even if it is a question courts must determine in reviewing jury instructions and the sufficiency of the evidence. *Terry*, 707 F.3d at 612-13. Thus, whatever the exact legal requirement for an explicit *quid pro quo* may be, it need not be spelled out in an indictment. *See United States v. Pawlowski*, 2017 WL 11350965, at *1 (E.D. Pa. Dec. 5, 2017) ("Regardless of the meaning of 'explicit,' because the Indictment charges that Pawlowski solicited campaign contributions . . . in exchange for the use of his official position

———————

statute goes so far beyond the language of the statute as to hold insufficient a pleading that tracks the statutory language." LAFAVE *et al.*, 5 CRIM. PROC.§ 19.3(b) & n. 68 (citing *Santeramo*). Because the Indictment here indisputably tracks the statutory language, the District Court should not have also required it to plead an implicit explicitness element that the District Court required thirty pages to interpret and explain.

47

to provide favorable treatment . . . in the award of con-
tract work . . . it adequately alleges a quid pro quo at
this stage in the proceedings.").

### b.    The Bribery Counts Sufficiently Allege Crimes

The District Court also erred in holding that it
could discern a complete "timeline of events" from the
Indictment, and that this timeline failed to satisfy the
legal requirement that "the explicit agreement must
precede the official conduct." (A. 53-54).

To start, it is doubtful that this legal requirement
exists. It certainly does not with respect to Count Two,
so far as that count charges Benjamin with soliciting a
bribe. Although the Government agrees that *McCor-
mick*'s requirement of an explicit *quid pro quo* applies
to Count Two, that can only mean that the crime is
*requesting* an explicit exchange—not that the official
actually entered one—given that in solicitation it is
the request or demand that completes the crime. *See*
18 U.S.C. § 666(a)(1)(B); *e.g.*, *United States v. Rooney*,
37 F.3d 847, 852 (2d Cir. 1994) (examining whether
unsuccessful solicitation would have resulted in cor-
rupt *quid pro quo* if accepted). Similarly, with respect
to Count Three, this Court has held that honest ser-
vices wire fraud requires neither a meeting of the
minds nor an official's intent to keep up his end of the
proposed *quid pro quo*. *Silver*, 948 F.3d at 550-52. And
because Count One charged conspiracy, it was the
agreement itself, not any particular actions taken to
further it, that constituted the crime, which would
seem to render timing legally irrelevant. *See United*

48

*States v. Laurent*, 33 F.4th 63, 86 (2d Cir. 2022) ("the crime of conspiracy is completed upon mere reaching agreement").

More generally, because bribery focuses on an official's intent to receive payment in exchange for a commitment to perform an official act, there is no apparent reason that official could not perform the act while still in the process of negotiating the details of the bribe. *See Evans*, 504 U.S. at 268 ("[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense."); *Ganim*, 510 F.3d at 141 (defining "quid pro quo agreement" as "a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the exercise of his official authority"); *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) ("[T]he timing of the payment in relation to the official act for which it is made is (in theory) irrelevant," as "[b]ribes often are paid before the fact, but . . . in certain situations the bribe will not actually be conveyed until the act is done").

But that legal question need not be resolved here, because the facts of this case render it immaterial. The District Court reasoned that Benjamin submitted his official request to allocate the $50,000 grant to FPSH in early June 2019, before many of interactions proving the agreement occurred. (A. 55). But even assuming the agreement had not crystallized at that point, the Indictment makes clear that ultimate disbursement of the grant to FPSH remained pending throughout all the relevant events, and that Benjamin

49

continued to have unilateral authority to revoke it.
(A. 10). That means Benjamin's *quo* was not complete
at any point in the Indictment, because an explicit
*quid pro quo* includes a promise or undertaking "to
perform or not to perform an official act." *McCormick*,
500 U.S. at 273. The Indictment further alleged that
FPSH had not received the grant by the time Migdol
was procuring contributions for Benjamin, and that ef-
forts to obtain the grant continued until news stories
revealed the connection between Migdol and the fraud-
ulent contributions to Benjamin's campaign. (A. 10-
11). Thus, even accepting the District Court's premise
that some future official conduct must be contem-
plated after an agreement is reached, that intent was
alleged here.

The District Court dismissed these facts because
"the Indictment does not allege that Migdol was aware
that Benjamin had any power to alter the grant."
(A. 57). But that detail is not an element of any offense,
or otherwise part of the "plain, concise, and definite
written statement of the essential facts constituting
the offense charged" which an Indictment must con-
tain. Fed. R. Crim. P. 7(c)(1). What is more, Migdol was
in fact aware that Benjamin could cancel the grant at
any time, and told the Government, in a memorialized
interview provided to the District Court, that the pos-
sible recall of the grant was part of his motivation to
collect small donations for Benjamin. (Dkt. 54-3 at 2).
Dismissing the bribery counts because the Indictment
did not contain an evidentiary detail—particularly one
that was likely to be proven at trial—strayed far from
the appropriate standard on a motion to dismiss. *See
United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir.

50

2021) ("At the indictment stage, we do not evaluate the adequacy of the facts to satisfy the elements of the charged offense. That is something we do after trial." (quoting *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021))).

The District Court reasoned that it could dismiss counts for factual insufficiency where "'the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial.'" (A. 56 (quoting *Alfonso*, 143 F.3d at 776-77)). But the Government had not made a full proffer, as it told the District Court. (*See, e.g.*, Dkt. 54 at 4 n.3 ("The [Indictment] does not set forth all of evidence the Government would offer at trial, and so the 'extraordinarily narrow' exception . . . which may apply where 'the Government has made what can fairly be described as a full proffer of the evidence it intends to present at trial,' is not relevant."); Dkt. 64 at 37 ("I think there would be evidence presented at trial on this point. But I'm focused on the indictment because we are only at the motion-to-dismiss stage at this point and not the sufficiency of the evidence.")). And as just discussed, the District Court had received the report of an interview containing evidence on the exact point the District Court found wanting. Under those circumstances, the District Court should not have dismissed counts because it did not believe the Government would prove every fact necessary for conviction. *See United States v. Sampson*, 898 F.3d 270, 280 (2d Cir. 2018) ("[A]lthough a judge may dismiss a civil complaint

51

pretrial for insufficient evidence, a judge generally cannot do the same for a federal criminal indictment.").[11]

Because the Indictment is a so-called "speaking indictment" that offers narrative detail beyond the bare elements of the crimes charged, the District Court asserted that it could "fairly describe the Indictment as something much closer to a full proffer than the

—————

[11] The factual nature of this question also defeats the District Court's reliance on *United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012). (*See* A. 56). In *Aleynikov* there was no factual question—especially because this Court heard the case after trial—and the questions were matters of pure statutory construction. *See* 676 F.3d at 76-82. The two district court cases cited by the District Court also concerned whether statutes applied to undisputed, dispositive facts. (*See* A. 56-57 (citing *United States v. Heicklen*, 858 F. Supp. 2d 256, 273-77 (S.D.N.Y. 2012); *United States v. Kerik*, 615 F. Supp. 2d 256, 271-74 (S.D.N.Y. 2009))). Only in *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000), was the indictment's failure to plead a specific fact at issue. But that fact—that the chairman of a company was also one of its shareholders, meaning he should have been listed on a tax form—was the fact that "made the omission in th[at] case criminal"; without it, there was no crime. *Id.* at 92-94. The same cannot be said of Migdol's awareness that Benjamin could cancel the grant, which is simply one of many facts proving that the contributions here were exchanged for official action.

indictment at issue in *Alfonso*." (A. 57). But this Court has previously found no full proffer where, as here, the Government used a speaking indictment that described evidence without purporting to contain all of it. *See Dawkins*, 999 F.3d at 779-89 & n.10.

That is because a full proffer must be full, not merely extensive. The "full proffer" exception "is extraordinarily narrow." *Sampson*, 898 F.3d at 282. This Court has found it satisfied where the Government "had filed an affidavit making a full proffer of the evidence to be presented at trial." *Alfonso*, 143 F.3d at 777 (describing *United States v. Mennuti*, 639 F.2d 107 (2d Cir. 1981)). Absent such a "detailed presentation of the *entirety* of the evidence that it would present to a jury," the exception does not apply. *Alfonso*, 143 F.3d at 777 (emphasis added). In *Sampson*, this Court thus reversed a district court's dismissal under the full proffer exception where, as here, there was oral argument on a motion to dismiss and the Government indicated that it would offer more evidence at trial. *Sampson*, 898 F.3d at 282-85.

In fact, in *Sampson*, as here, the disputed issue was one of timing as it bore on mental state, which this Court characterized as a factual matter not susceptible to resolution on a motion to dismiss. *Id.* at 285. Thus here, as in *Sampson*, the District Court "applied an erroneous legal standard to reach a premature conclusion." *Id.*; *see also id.* at 281 ("Because of this critical fact-finding role of the jury, the Supreme Court has admonished that 'where intent of the accused is an ingredient of the crime charged, its existence is a question of fact' that a judge cannot resolve on the jury's

53

behalf." (quoting *Morissette v. United States*, 342 U.S. 246, 274 (1952))); *McCormick*, 500 U.S. at 270 ("matters of intent are for the jury to consider").

## CONCLUSION

**The District Court's order dismissing Counts One, Two, and Three should be reversed, and this case should be remanded for trial on all counts in the Indictment.**

Dated:    New York, New York
          January 27, 2023

                         Respectfully submitted,

                         DAMIAN WILLIAMS,
                         *United States Attorney for the*
                         *Southern District of New York,*
                         *Attorney for the United States*
                            *of America.*

JARROD L. SCHAEFFER,
HAGAN SCOTTEN,
      *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,305 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: HAGAN SCOTTEN,
*Assistant United States Attorney*