# 22-3091-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

– v. –

BRIAN BENJAMIN,

*Defendant-Appellee,*

GERALD MIGDOL, AKA Sealed Defendant 1, AKA Gerald Migol,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

BARRY H. BERKE
DANI R. JAMES
DARREN LAVERNE
KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Attorneys for Defendant-Appellee*
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ..............................1

STATEMENT OF THE CASE.................................................................................1

I.      The Bribery Allegations ......................................................5

II.     The Proceedings Below ......................................................9

        A.     The Government's Admissions...............................9

        B.     The District Court's Decision .............................10

SUMMARY OF ARGUMENT .......................................................14

ARGUMENT ............................................................................16

I.      *McCormick* Requires in Campaign-Contribution Cases That the *Quid Pro Quo* Be Explicit, Not Implicit .....................................16

        A.     The Bedrock Democratic and First Amendment Principles Underlying *McCormick* ......................................16

        B.     The Government Disregards the Plain Language of *McCormick* and the Principles Underlying It......................21

        C.     The Government's Misreading of *Evans v. United States* ..................24

II.     This Court Has Held That *Evans* Applies in Non-Campaign-Contribution Cases and That, Under *McCormick*, Explicit Means Express......................................................28

        A.     The Law in This Circuit .....................................28

            1.    *Garcia* and *Ganim* Are Binding Precedent...............28

            2.    The Due Process Clause Prohibits Imposition of Criminal Liability Here......................................36

        B.     The Law in Other Circuits...................................38

III.    The District Court Properly Dismissed the Bribery Counts Because They Do Not Allege an Explicit *Quid Pro Quo* ...........................43

i

A.     The Bribery Counts Fail to Charge an Essential Element ..................43

B.     The Bribery Counts Do Not Sufficiently Allege a Crime..................50

CONCLUSION .........................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agostini v. Felton*,
    521 U.S. 203 (1997)........................................................................28

*Chery v. Garland*,
    16 F.4th 980 (2d Cir. 2021) ..........................................................43

*Evans v. United States*,
    504 U.S. 255 (1992)..................................................................*passim*

*Fed. Election Comm'n v. Cruz*,
    142 S. Ct. 1638 (2022)...................................................12, 17, 21

*Gearing v. United States*,
    432 F.2d 1038 (5th Cir. 1970) ......................................................45

*Hohn v. United States*,
    524 U.S. 236 (1998)..............................................................27, 28

*Holland v. United States*,
    348 U.S. 121 (1954)......................................................................24

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
    73 F.3d 497 (2d Cir. 1996) ...........................................................34

*McConnell v. Fed. Election Comm'n*,
    540 U.S. 93 (2003)........................................................................18

*McDonnell v. United States*,
    579 U.S. 550 (2016)..............................................................17, 18

*McCormick v. United States*,
    500 U.S. 257 (1991)..................................................................*passim*

*McCutcheon v. Fed. Election Comm'n*,
    572 U.S. 185 (2014)..........................................................4, 12, 17

*Patsy's Italian Rest., Inc. v. Banas*,
    508 F. Supp. 2d 194 (E.D.N.Y. 2007) .....................................34, 35

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
    490 U.S. 477 (1989).................................................................28

*Rosemond v. United States*,
    572 U.S. 65 (2014)..................................................................24

*Sash v. Zenk*,
    428 F.3d 132 (2d Cir. 2005) ...................................................36

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 44 (1996)..................................................................33

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012) ..............................................*passim*

*United States v. Alfonso*,
    143 F.3d 772 (2d Cir. 1998) ...................................................55

*United States v. Birch*,
    470 F.2d 808 (4th Cir. 1972) ..................................................45

*United States v. Blagojevich*,
    794 F.3d 729 (7th Cir. 2015) ..................................................40

*United States v. Blandford*,
    33 F.3d at 688 (6th Cir. 1994) ..........................................39, 47

*United States v. Brennan*,
    183 F.3d 139 (2d Cir. 1999) ...................................................37

*United States v. Carpenter*,
    961 F.2d 824 (9th Cir. 1992) ..................................................41

*United States v. Correia*,
    55 F.4th 12 (1st Cir. 2022)................................................39, 40

*United States v. Davis*,
    30 F.3d 108 (11th Cir. 1994) ..................................................44

*United States v. Davis*,
    33 F.4th 1236 (9th Cir. 2022) .................................................45

iv

*United States v. Davis*,
   841 F. App'x 375 (3d Cir. 2021) ........................................................40

*United States v. Donagher*,
   520 F. Supp. 3d 1034 (N.D. Ill. 2021) ........................................44, 46

*United States v. Dozier*,
   672 F.2d 531 (5th Cir. 1982) .............................................................23

*United States v. Foley*,
   73 F.3d 484 (2d Cir. 1996) .................................................45, 48, 49

*United States v. Ganim*,
   510 F.3d 134 (2d Cir. 2007) ......................................................*passim*

*United States v. Garcia*,
   992 F.2d 409 (2d Cir. 1993) ......................................................*passim*

*United States v. Gonzalez*,
   110 F.3d 936 (2d Cir. 1997) .............................................................44

*United States v. Heicklen*,
   858 F. Supp. 2d 256 (S.D.N.Y. 2012) .............................................57

*United States v. Kerik*,
   615 F. Supp. 2d 256 (S.D.N.Y. 2009) .............................................57

*United States v. Kincaid-Chauncey*,
   556 F.3d 923 (9th Cir. 2009) ...........................................................38

*United States v. Lanier*,
   520 U.S. 259 (1997)..........................................................................36

*United States v. MacPherson*,
   424 F.3d 183 (2d Cir. 2005) .............................................................24

*United States v. Ng Lap Seng*,
   934 F.3d 110 (2d Cir. 2019) .............................................................47

*United States v. Oshatz*,
   912 F.2d 534 (2d Cir. 1990) .............................................................35

*United States v. Percoco*,
   317 F. Supp. 3d 822 (S.D.N.Y. 2018) ................................................44

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000) ...........................................................*passim*

*United States v. Rosen*,
   716 F.3d 691 (2d Cir. 2013) ......................................................11, 31

*United States v. Salameh*,
   152 F.3d 88 (2d Cir. 1998) ...............................................................24

*United States v. Sampson*,
   898 F.3d 270 (2d Cir. 2018) .............................................................55

*United States v. Santeramo*,
   45 F.3d 622 (2d Cir. 1995) .........................................................48, 49

*United States v. Seminerio*,
   2010 WL 3341887 (S.D.N.Y. Aug. 20, 2010)...........................47, 48

*United States v. Serrano*,
   191 F. Supp. 3d 287 (S.D.N.Y. 2016) .......................................45, 46

*United States v. Siegelman*,
   640 F.3d 1159 (11th Cir. 2011) ........................................................42

*United States v. Silver*,
   948 F.3d 538 (2d Cir. 2020) ......................................................11, 31

*United States v. Sun-Diamond Growers of Cal.*,
   526 U.S. 398 (1999)..........................................................................47

*United States v. Terry*,
   707 F.3d 607 (6th Cir. 2013) ..........................................40, 41, 42, 48

*United States v. Tomblin*,
   46 F.3d 1369 (5th Cir. 1995) ...........................................................40

*United States v. Turner*,
   684 F.3d 244 (1st Cir. 2012)..............................................................38

*United States v. Wedd*,
993 F.3d 104 (2d Cir. 2021) ................................................................55

**Statutes & Other Authorities**

18 U.S.C. § 371 ........................................................................................6

18 U.S.C. § 666 ..................................................................................6, 44

18 U.S.C. § 1343 ......................................................................................6

18 U.S.C. § 1346 ......................................................................................6

18 U.S.C. § 1519 ......................................................................................6

18 U.S.C. § 2314 ....................................................................................57

26 U.S.C. § 7206(1) ...............................................................................55

Brief for the United States, *Evans v. United States*,
504 U.S. 255 (1992) (No. 90-6105), 1991 WL 527605 ...................26

Brief for the United States of America, *United States v. Rosen*,
716 F.3d 691 (2d Cir. 2013) (No. 12-2249), 2012 WL 3900585 ...............31, 32

Brief for the United States of America, *United States v. Silver*,
948 F.3d 538 (2d Cir. 2020) (No. 18-2380), 2018 WL 6039487 .....................32

Indictment, *United States v. Pawlowski*,
No. 5:17-Cr-390-JS (E.D. Pa. Dec. 5, 2017), 2017 WL 3380968.....................48

Omnibus Memorandum of Law in Opposition to Defendants' Pretrial
Motions, *United States v. Mangano*,
No. 16-Cr-540 (JMA) (E.D.N.Y. Feb. 9, 2018) ...........................................32, 33

Defendant-Appellee Brian Benjamin respectfully urges affirmance of the Opinion and Order of the United States District Court for the Southern District of New York, by the Honorable J. Paul Oetken, dismissing Counts One through Three of the Indictment for failure to allege an explicit *quid pro quo.*[1]

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

*McCormick v. United States* and its progeny require that when an alleged bribe consists solely of political campaign contributions, the government must prove that there was an "explicit" *quid pro quo* between the candidate and contributor. This case presents the question whether the district court—relying on *McCormick*, the bedrock First Amendment principles underlying it, and this Court's decisions in *United States v. Garcia* and *United States v. Ganim*—correctly held that an indictment purporting to allege an **implicit** *quid pro quo* did not sufficiently plead an **explicit** *quid pro quo*, requiring dismissal of the bribery counts.

## STATEMENT OF THE CASE

This is the only case in the long history of this Circuit where the government has charged a public official with bribery based solely on campaign

---

[1] Citations to "Br." refer to the government's appeal brief. Citations to "A." refer to the appendix filed with the government's appeal brief. Citations to "Dkt." refer to an entry on the district court's docket for this case.

contributions.  It is the only case, in any circuit, where the government has pursued such a prosecution on allegations as thin as those here.

The rule in *McCormick v. United States*, 500 U.S. 257 (1991), is designed to protect our democracy from precisely this kind of government overreach, which casts a pall over the democratic process and lawful political fundraising.  The district court properly applied *McCormick* and dismissed the bribery charges against Mr. Benjamin, who until his indictment was the sitting Lieutenant Governor of New York and a candidate for that office on the Democratic primary ballot.

In the more than thirty years since *McCormick*, the Supreme Court has repeatedly recognized that there must be a clear standard separating what the law considers to be corrupt agreements from legitimate political fundraising.  The touchstone of that standard for a bribery prosecution based solely on campaign contributions is an explicit *quid pro quo*.  To be unlawful, an alleged agreement to exchange campaign contributions for official action must be explicit: not inferred from ambiguous statements or a chronology of events, but *explicit*, meaning clearly and unambiguously expressed by the parties.  In attempting to resuscitate the charges in this case, the government disregards the very purpose of this rule and proposes to render it meaningless.

The parties agree that the "bribe" alleged in the Indictment (the *quid*) consists solely of campaign contributions to Mr. Benjamin (as opposed to cash, jewelry, gifts, or other personal benefits) when he was a state senator preparing to run for New York City Comptroller. The official action allegedly procured (the *quo*), they likewise agree, is legitimate constituent services, namely a $50,000 state grant to a nonprofit benefiting schoolchildren in Mr. Benjamin's senate district of Harlem.

The alleged *pro* tying those two lawful acts together depends entirely on strained inferences the government tries to draw from the timeline of events set forth in the Indictment and the highly ambiguous alleged statement by Mr. Benjamin: "Let me see what I can do." The Indictment alleges that Mr. Benjamin uttered that statement not simply before the grant was mentioned, promised, or made, but months before he even knew, or could have known, the grant would become available.

In dismissing the bribery charges, the district court faithfully applied *McCormick* and the First Amendment principles underlying that decision. It correctly held that, in the rare prosecution based solely on campaign contributions, "sanctionable conduct must cross a clear line of impropriety, because 'to hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable

3

so long as election campaigns are financed by private contributions.'" (A. 47-48 (quoting *McCormick*, 500 U.S. at 272)). The district court also faithfully applied the law of this Circuit, as set forth in the two controlling precedents interpreting *McCormick*: *United States v. Garcia*, 992 F.2d 409 (2d Cir. 1993), and *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007). Those decisions, which the government has previously cited and relied on as controlling law, reaffirm that "explicit" means "express," as opposed to inferred or implied (which a *quid pro quo* may be in non-campaign-contribution cases).

The government's position on appeal boils down to two unsupportable propositions: that "explicit" can mean its opposite—"implicit"—and that what the prosecution must allege in a campaign-contribution case is no different from what it must allege in any run-of-the-mill bribery prosecution.

That is an erroneous and dangerous position. As the district court held, "This is a case where First Amendment principles are not tangential to the validity of the prosecution, but rather central to it." (A. 48). In seeking to overturn the decision below, the government would have this Court ignore those principles, renounce this Court's decisions designed to safeguard them, and disregard the Supreme Court's repeated direction that courts "err on the side of protecting political speech rather than suppressing it." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 209 (2014).

4

The Court should reject that invitation and affirm.

## I.       The Bribery Allegations

On April 11, 2022, the government filed a twenty-two-page speaking indictment against Mr. Benjamin (A. 2-22), which the government confirmed "lays out clearly the prosecution's theory."  (Dkt. 52-5 at 2 (internal quotation marks omitted)).  The charges in the Indictment stem from a purported bribery scheme relating to Mr. Benjamin's 2021 primary campaign for New York City Comptroller.

At the time of that campaign, Mr. Benjamin was serving as a New York State Senator, representing District 30, which includes Harlem and surrounding neighborhoods.  (A. 2).  Mr. Benjamin sought contributions to his comptroller campaign from Gerald Migdol—a longtime supporter of Mr. Benjamin and Harlem businessman and philanthropist.  Around the same time, in his capacity as a state senator, Mr. Benjamin allocated a grant of state funds to a nonprofit organization supported by Migdol, Friends of Public School Harlem ("FPSH"), which provided school supplies and other resources to public school students in Mr. Benjamin's senate district.  (A. 2).[2]

---

[2]      In the Indictment, Migdol is described as "CC-1" and FPSH as "Organization-1."  Both were publicly identified in the course of the proceedings below.

5

The Indictment purports to allege that this was a corrupt exchange—campaign contributions for state funding. Based on that premise, it charges Mr. Benjamin with, among other things, conspiracy to commit bribery and honest-services fraud (Count One—18 U.S.C. § 371), bribery (Count Two—18 U.S.C. § 666), and honest-services wire fraud (Count Three—18 U.S.C. §§ 1343, 1346).[3]

Yet, nowhere in the Indictment is there any allegation of an explicit *quid pro quo* between Mr. Benjamin and Migdol. The bribery scheme was allegedly set in motion during a meeting on March 8, 2019, between Mr. Benjamin and Migdol in the latter's home. During that meeting, the Indictment alleges, Mr. Benjamin told Migdol he planned to run for New York City Comptroller and asked Migdol to obtain small-dollar contributions for his comptroller campaign. (A. 4). Migdol demurred, allegedly advising Mr. Benjamin that (i) he "did not have experience bundling political contributions in this manner"; (ii) his "fundraising efforts were focused" on FPSH; and (iii) his "ability to procure" contributions for Mr. Benjamin's comptroller campaign "was limited, in part because potential donors" from whom he was "likely to solicit contributions were the same donors"

---

[3]     The Indictment also charges Mr. Benjamin with two counts of falsification of records in violation of 18 U.S.C. § 1519. The district court declined to dismiss those charges, which are still pending, and not at issue here.

from whom he had "solicited and intended to further solicit contributions" for FPSH. (A. 4-5).

The Indictment alleges that Mr. Benjamin then offered the vague response, "Let me see what I can do." (A. 5). There is no allegation in the Indictment that at that meeting either man contemplated, much less agreed, that Mr. Benjamin would allocate state funds to FPSH in exchange for Migdol's procuring contributions for Mr. Benjamin's comptroller campaign. Indeed, as the Indictment alleges, it was not until May 30, 2019 that Mr. Benjamin learned he had additional discretionary funding to allocate to nonprofits in his district (such as FPSH) for educational purposes. (A. 6).

On that day (almost three months after the Benjamin/Migdol meeting), according to the Indictment, "the senate's Majority Leader and senate staff informed certain senators," including Mr. Benjamin, "that they had been awarded additional discretionary funding that each could allocate to organizations in their districts for specified purposes." (*Id*.). That funding included, among other things, "up to $50,000" that Mr. Benjamin "could allocate to school districts, libraries, or non-profit organizations for educational purposes." (*Id*.).

The Indictment alleges that Mr. Benjamin advised Migdol the following day that he "intended to procure a $50,000 grant" for FPSH. (*Id*.). But

7

it ***does not*** allege that Mr. Benjamin placed any conditions on his effort to obtain the grant or otherwise linked it to any campaign contributions.

Nor is there any allegation that Mr. Benjamin made any demands of Migdol when he notified him weeks later (on June 20, 2019) that the Senate had approved a resolution reflecting the $50,000 grant. (A. 6-7). When Mr. Benjamin allegedly sent Migdol a screenshot of the resolution asking, "Do you recognize the 3rd entity on the list," Migdol responded, "I do very much—does it mean what I'm hoping?" (A. 7). In response, Mr. Benjamin simply "confirmed, in part, 'Oh yes it does. We passed the resolution yesterday! $50k. [. . .] I will call to discuss!'" (*Id.*).

The Indictment alleges that two weeks later, on July 9, 2019, Migdol met Mr. Benjamin at his senate district office in Harlem and provided Mr. Benjamin with three checks totaling $25,000 for his senate campaign—that is, not the small-dollar contributions for his *comptroller* campaign that purportedly had been the subject of their March meeting. (A. 7-8). During that meeting, the Indictment alleges that Mr. Benjamin "reminded" Migdol about the state grant and that he "still expected" Migdol "to procure numerous small contributions for his Comptroller Campaign." (A. 8). But the Indictment ***does not*** allege that Mr. Benjamin connected the two, much less did so explicitly, or threatened to withhold or cancel the grant if Migdol did not secure the desired contributions.

8

Similarly, there is no allegation that on September 12, 2019, when Mr. Benjamin publicly presented Migdol and the nonprofit organization FPSH with "an oversized novelty check in the amount of $50,000," either man said anything about campaign contributions. (A. 9). The Indictment does allege that, from October 2019 to January 2021, Migdol made "numerous contributions to the Comptroller Campaign, many of which were fraudulent," but it ***does not*** allege that Migdol and Mr. Benjamin discussed the $50,000 grant in October or ever again. (A. 10). Nor does the Indictment charge Mr. Benjamin with the straw-donor scheme alleged against Migdol. The $50,000 grant was never disbursed to FPSH. (A. 11).

## II.    The Proceedings Below

### A.    The Government's Admissions

On May 20, 2022, the government sent a letter to the defense declining to issue a bill of particulars on the ground that the Indictment "contains detailed allegations specifying the crimes charged" and "lays out clearly the prosecution's theory," and asserting that "what is said in the indictment is the prosecution's theory." (Dkt. 52-5 at 2 (internal quotation marks omitted)). Subsequently, in responding to Mr. Benjamin's motion to compel further particulars, the government stated that the Indictment set forth "more than fourteen pages of speaking allegations" that "provide additional details regarding the charged crimes." (Dkt. 54 at 12).

### B.    The District Court's Decision

In a thirty-eight-page decision, the district court granted Mr. Benjamin's motion to dismiss the bribery counts. The court relied on *McCormick*, its progeny, and the Supreme Court's rationale in *McCormick* for requiring an explicit *quid pro quo* in campaign-contribution cases. The district court specifically noted the Supreme Court's "concern with criminalizing common political conduct" (A. 32), and reluctance to "open to prosecution . . . conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation" (A. 33 (quoting *McCormick,* 500 U.S. at 272-73)).

The court then rejected the government's argument that *McCormick* was overruled or modified by *Evans v. United States*, 504 U.S. 255 (1992), a case that, it noted, involved **both** "a $7,000 cash bribe and $1,000 in campaign contributions" (unlike *McCormick* which involved only the latter). (A. 35). Under *Evans*, the district court concluded, a *quid pro quo* could be "proven inferentially" in non-campaign-contribution cases (A. 34), but the Supreme Court in *Evans* "did not purport to overrule or alter the standard in *McCormick* for campaign contribution cases" requiring proof of an "explicit" *quid pro quo* (A. 37).

The district court further determined that this Court had clearly stated in *Garcia* that "*Evans* modified [the *McCormick* standard] in *non-campaign*

*contribution* cases," and, subsequently, in *Ganim*, that "proof of an *express promise* is necessary when the payments are made in the form of campaign contributions."  (A. 37 (emphasis added) (quoting *Garcia*, 992 F.2d at 414; *Ganim*, 510 F.3d at 142)).  The court rejected the government's argument that those clear statements were "wrong" or merely dicta, concluding that they were part of the Court's reasoning necessary to reach the holdings in those cases.  (A. 38).

Even if these statements were dicta, the court held, they should be given great weight, as "the conclusion that *Evans* modified the standard for non-contribution cases has now been repeated . . . in two other Second Circuit cases." (*Id.* (citing *United States v. Silver*, 948 F.3d 538, 548 (2d Cir. 2020); *United States v. Rosen*, 716 F.3d 691, 701 (2d Cir. 2013)).  In this regard, the court noted that basic principles of fairness required it to follow this Court's "clear" rulings with regard to the governing law in a criminal case.  (*Id.*).

Next, the district court analyzed the meaning of "explicit" and concluded that "if one thing is clear, it is that an 'explicit' promise cannot be satisfied by implication, as it would be contradictory to hold that a *quid pro quo* agreement could be simultaneously 'explicit' and 'implicit.'"  (A. 40).  The court summarized its holding on this point at follows:

> [F]or criminal liability for bribery in the context of
> campaign contributions, there must be a *quid pro quo* that
> is clear and unambiguous, meaning that (1) the link
> between the official act and the payment or benefit—the

> *pro*—must be shown by something more than mere implication, and (2) there must be a contemporaneous mutual understanding that a specific *quid* and a specific *quo* are conditioned upon each other.

(A. 46).

Constitutional considerations also played an important role in the court's conclusion. As it noted, just last Term the Supreme Court reiterated that "[t]he First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" (A. 47 (quoting *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1650 (2022)). Drawing on the Court's decisions in *Cruz*, *McCutcheon*, and *McCormick* itself, the court noted that an "official act taken in the hope that it will yield campaign contributions is not a bribe; it is a basic aspect of the American political system." (A. 48). The court concluded that it was required to "err on the side of protecting political speech rather than suppressing it." (*Id*. (quoting *McCutcheon*, 572 U.S. at 209)).

In addition, the district court concluded that imposing criminal liability where the charged conduct did not clearly involve an explicit *quid pro quo* would implicate the Due Process Clause as interpreted by the Supreme Court. (A. 49). In this regard, the court determined that "the governing precedents were not clear enough to give [Mr.] Benjamin fair notice of what behavior [was] criminal at the time he acted," and that, accordingly, "[t]o impose—or even charge—criminal liability in the Second Circuit where the conduct did not clearly

12

involve an 'explicit' *quid pro quo* would create a significant fair-warning

problem." (*Id.* (internal quotation marks and citation omitted)).

      The district court also recognized that the *McCormick* standard is an

implied element that must be alleged in the Indictment. (A. 49-50). The

Indictment here did not allege an explicit *quid pro quo*. The phrase "in exchange

for" in the Indictment, on which the government relied, was not synonymous with

explicit or express (and was instead simply the same formulation it uses in non-

campaign-contribution cases). (A. 51). For those reasons, the district court

concluded the bribery allegations must be dismissed. (A. 50-53).

      Finally, and as a separate ground for dismissing the bribery charges,

the district court found that the factual allegations in the Indictment, even if true,

did not allege the crime of bribery. The district court relied on this Court's

precedents in *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000), and *United States

v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012), among other cases, in ruling that the

Indictment must be dismissed for "fail[ing] to allege a crime within the terms of

the applicable statute." (A. 53 (quoting *Aleynikov*, 676 F.3d at 75-76)). Accepting

the allegations in the Indictment as true, the court held that they did not allege an

explicit *quid pro quo*, and rejected the government's argument that it could apply

*Evans* to infer such an agreement. (A. 54).

In reaching its decision, the district court noted that according to the Indictment, when Mr. Benjamin sought the grant allocation for FPSH he had not yet made an agreement (much less an explicit agreement) with Migdol controlling his decision to do so; and the Indictment failed to meet the basic requirement of *McCormick* that the *quid pro quo* be "clear and unambiguous and in turn control[] the [official] action" allegedly taken as part of that agreement.  (A. 54-55).  The district court observed that the Indictment's fourteen pages of factual allegations drew "a clear picture of the government's theory about the allegedly illegal agreement between [Mr.] Benjamin and Migdol."  (A. 56-57).  That theory did not constitute a crime under the law.  (*Id*.)

## SUMMARY OF ARGUMENT

The district court properly applied Supreme Court precedent and the law of this Circuit to dismiss the bribery charges against Mr. Benjamin. *McCormick* requires that the government allege an "explicit" *quid pro quo*, which (as the government itself has previously agreed, *see infra* pp. 31-33) this Court has interpreted to mean "express" and is distinguished from one that is implicit.  The district court correctly held that the Indictment lacks any allegation of an explicit or express *quid pro quo*, and instead purports to allege an agreement that was implicit at best, requiring dismissal of the bribery counts.

14

The court correctly rejected the unsupported, watered-down version of the *McCormick* rule proposed by the government, which does not meaningfully distinguish between campaign contributions and personal bribes, the distinction at the heart of *McCormick*. The government relies on out-of-circuit cases interpreting *McCormick* and *Evans* that are of course not controlling authority and, given this Court's precedents directly on point, not even persuasive authority. But even with regard to these decisions, the government grossly overstates the holdings in those cases, most of which did not solely involve campaign contributions and thus do not implicate the same First Amendment issues so sharply presented here.

In ***none*** of the government's out-of-circuit cases did a court consider an indictment purporting to allege a *quid pro quo* that, as here, was entirely implicit, based simply on the timing of events and ambiguous statements. Rather than supporting the government's argument, those cases make clear how dangerously far the government has overreached.

Finally, the district court properly applied the law in dismissing the bribery counts. As this Court has held, an implied element must be clearly alleged in an indictment, or else there can be no assurance that the grand jury considered all elements of the offense. An explicit *quid pro quo*, which the government must prove beyond a reasonable doubt to prevail, is an implied element of the bribery charges that must be clearly alleged in the Indictment.

15

Separately, it is clear from the factual allegations in the Indictment (which the government has conceded fully set forth the theory of its prosecution) that those allegations do not constitute the charged crime of bribery. The district court, relying on this Court's decisions in *Pirro* and *Aleynikov*, among other cases, properly dismissed on this basis as well.

## ARGUMENT

### I. *McCormick* Requires in Campaign-Contribution Cases That the *Quid Pro Quo* Be Explicit, Not Implicit

#### A. The Bedrock Democratic and First Amendment Principles Underlying *McCormick*

There is a reason campaign contributions are so rarely prosecuted as bribes, and have never been the sole basis for a prosecution in this Circuit: Doing so without an explicit corrupt scheme risks upending our representative democracy and the political fundraising underlying it. This case therefore implicates democratic and First Amendment values that lie at the heart of our political process.

The Supreme Court has made clear that there is a difference between lawful influence or access by donors, on the one hand, and corrupt *quid pro quo* arrangements, on the other. The Court reiterated the importance of this distinction just last year, reaffirming a principle that it has stated time and again:

As we have explained, influence and access "embody a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." ***To be sure, the "line between* quid pro quo *corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights." And in drawing that line, "the First Amendment requires us to err on the side of protecting political speech rather than suppressing it***."

*Cruz*, 142 S. Ct. at 1653 (emphasis added) (quoting *McCutcheon*, 572 U.S. at 192, 209). In *McCutcheon*, the Court explained that ingratiation and access "embody a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." 572 U.S. at 192.

In *McDonnell v. United States*, the Court overturned the bribery convictions of the former governor of Virginia and his wife, explaining that "[t]he basic compact underlying representative government assumes that public officials will hear from their constituents and act appropriately on their concerns." 579 U.S. 550, 575 (2016). That case turned on what constitutes an "official act" under the bribery statute, but the Court spoke directly to what the government is trying to do in this prosecution:

> The basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns— whether it is the union official worried about a plant

> closing or the homeowners who wonder why it took five days to restore power to their neighborhood after a storm. The Government's position could cast a pall of potential prosecution over these relationships if the union had given a campaign contribution in the past or the homeowners invited the official to join them on their annual outing to the ballgame. Officials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse.

*Id*. at 575 (internal citations omitted); *see also McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 297 (2003) (Kennedy, J., concurring in part and dissenting in part) ("Favoritism and influence are not . . . avoidable in representative politics).

As all of these decisions recognize, it is not a crime when elected officials take actions that are supported by or benefit those who have contributed to their campaigns and advocated for those actions. Bribery prosecutions in this context threaten to elide the distinction between legitimate political activity and truly corrupt bargains.

As the district court explained, these core democratic and First Amendment principles are at the heart of the Supreme Court's decision in *McCormick*. There, the government charged the defendant, a state legislator, with

Hobbs Act extortion[4] in connection with payments he received from a lobbyist

during his campaign.  After sponsoring legislation that furthered the interests of a

group of foreign doctors represented by the lobbyist, the defendant told the

lobbyist that his re-election campaign was "expensive," that he had spent

substantial money "[from] his own pocket," and that he "had not heard anything

from the foreign doctors."  500 U.S. at 260.  Using virtually the same ambiguous

words Mr. Benjamin is alleged to have uttered in in this case, the lobbyist

responded that he would reach out to the foreign doctors and "see what he could

do." *Id*.

After the lobbyist did so, the foreign doctors sent the defendant

multiple cash payments via the lobbyist in an envelope containing nine $100 bills.

*Id*.  The doctors subsequently sent the defendant several additional cash payments.

*Id*.  The defendant then sponsored and advocated for legislation supported by the

doctors, which was passed and signed into law.  *Id*.  Two weeks later, the

defendant received another cash payment from the doctors.  *Id*.  He was charged

with extortion and convicted at trial.

---

[4]     The Court dealt in *McCormick* with the extortion statute, but the parties
agree that its holding applies equally to bribery cases. It applies to the statutes at
issue here, as decisions since *McCormick* have held.  (Br. 15 and A. 31 n.4 (citing
cases); *see also* Dkt. 53 at 32-34).

The Supreme Court reversed the defendant's conviction, holding that the receipt of campaign contributions violates the statute "only if the payments are made in return for an ***explicit promise or undertaking*** by the official to perform or not to perform an official act." *Id*. at 273 (emphasis added). The Court further explained, "[i]n such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking." *Id*. Importantly, the Court set forth the concerns animating its decision:

> Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." ***To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation***.

*Id*. at 272 (emphasis added). As if speaking about this very case, the Court went on to state:

> Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on

20

platforms and who claim support on the basis of their
views and what they intend to do or have done.

*Id*.

The rule that *McCormick* established—requiring an explicit *quid pro
quo*—has since served to draw a clear line between a corrupt bargain and
legitimate campaign fundraising.  Since *McCormick*, the Supreme Court has
repeatedly reaffirmed this core principle of protecting lawful fundraising from
government overreach.  The Supreme Court has described the "influence and
access" that come with campaign contributions as a "central feature of [our]
democracy" and added that the First Amendment "has its fullest and most urgent
application precisely to the conduct of campaigns for political office."  *Cruz*, 142
S. Ct. at 1650, 1653) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272
(1971)).

> ### B.   The Government Disregards the Plain Language of *McCormick* and the Principles Underlying It

The government proposes a reading of *McCormick* that disregards
these principles and the plain language of the opinion, and is far narrower than any
court has ever held.  The government effectively reads the word "explicit" out of
the decision, divorces the holding from the Court's underlying concerns, suggests
that any kind of *quid pro quo* exchange would suffice under the *McCormick*
standard, and erases the distinction between campaign-contribution and personal

benefit cases.  (*See, e.g.*, Br. 18 ("The *McCormick* Court's concern was that the jury had been instructed that it could convict a politician who received campaign contributions without finding any *quid pro quo* at all.")).  The government's reading of *McCormick* draws no real distinction between what it must prove in a campaign-contribution case and any other bribery case; in its view, the decision requires simply a *quid pro quo*, whether explicit, express, implied, inferred, or merely hinted at.

Clearly, however, given the words the Supreme Court used in describing the kind of proof required in this context, and its expressed concern that lawful campaign contributions not be swept into a government dragnet, a *quid pro quo* by implication does not meet the Court's standard.  Further, the Court reversed on the facts of the case—where there was ***more*** evidence to suggest a corrupt *quid pro quo* than is alleged here—making it clear that an implied *quo pro quo* is not enough in the campaign-contributions context.  The Court held that the district court's jury instruction (which did not require proof of a *quid pro quo*) was flawed, but it went further, concluding that "the main issue throughout this case has been *whether under proper instructions the evidence established* a Hobbs Act violation and, as our opinion indicates, *it is far from 'perfectly clear' that the Government has met its burden in this regard*."  *McCormick*, 500 U.S. at 267 n.5 (emphasis added).  The dissent disagreed with the majority for requiring "proof that petitioner

made an 'explicit' promise (or threat) in exchange for a campaign contribution." *Id.* at 281 (Stevens, J., dissenting).

The government does not address any of this in its brief. Instead, it relies on the Court's isolated and passing reference to *United States v. Dozier*, 672 F.2d 531 (5th Cir. 1982), and the Department of Justice Manual as evidence that any kind of *quid pro quo* would meet the *McCormick* standard in campaign-contribution cases. Contrary to the government's claim (Br. 19), *McCormick* did not endorse, or even mention, the *Dozier* jury instructions. Rather, it cited language elsewhere in *Dozier* requiring proof of a *quid pro quo*, with no discussion of the facts or issues presented in that case. *McCormick*, 500 U.S. at 273.

In referencing the DOJ Manual, the Court simply pointed out that the government itself believed that a *quid pro quo* agreement was required to bring a Hobbs Act case based on campaign contributions, noting that the government had quoted the Manual to that effect. *Id.* In neither reference did the Court say anything to undermine its holding requiring the *quid pro quo* to be one where campaign contributions were made "in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.*

In addition to misreading *McCormick*, the government criticizes the district court for what it absurdly characterizes as the "District Court's rejection of circumstantial evidence." (Br. 22). None of the wholly inapposite cases cited by

the government involves a crime for which the Supreme Court had imposed a substantive requirement of explicitness to protect constitutional values, as in *McCormick*. (*See id.* at 20-21 (citing *Rosemond v. United States*, 572 U.S. 65, 78 n.9 (2014) (firearm in furtherance of drug-trafficking offense); *Holland v. United States*, 348 U.S. 121, 140 (1954) (income tax evasion); *United States v. Salameh*, 152 F.3d 88, 143 (2d Cir. 1998) (terrorism-related offenses); *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005) (currency structuring))). Moreover, the district court of course did not reject the use of circumstantial evidence—such a sweeping pronouncement is nowhere in its opinion. The use of circumstantial evidence at trial to prove intent does not relieve the government of the burden to allege, and then prove, that there was in fact an explicit *quid pro quo*, as it must to prevail in the rare prosecution based solely on campaign contributions.

### C.     The Government's Misreading of *Evans v. United States*

The government also relies heavily on *Evans v. United States*, which it argues applies where the alleged bribes "involve" campaign contributions. The government claims that *Evans* supports its view that, notwithstanding *McCormick*, an explicit *quid pro quo* may in fact be implicit. This oxymoronic reasoning misreads the *Evans* opinion itself and is also directly at odds with this Court's clearly stated understanding of *Evans*.

As with *McCormick*, in discussing *Evans*, the government omits or glosses over critical facts and the animating purpose of the decision. As the district court noted, in *Evans*, the Supreme Court granted certiorari to resolve a question different from that at issue in *McCormick*: whether "an affirmative act of inducement by a public official, such as a demand, is an element of the offense of extortion 'under color of official right,' prohibited by the Hobbs Act.'" *Evans*, 504 U.S. at 256.

In *Evans*, an undercover FBI agent, posing as a real estate developer, recorded on audio and videotape a series of conversations in which the agent sought assistance from the defendant, a county official, in rezoning a tract of land. The FBI agent handed the defendant a $1,000 check made out to the defendant's campaign and $7,000 in cash. *Id*. at 257. Importantly, the defendant reported only the check on the relevant campaign-finance disclosure forms, not the cash. *Id*. The government claimed and proved that the cash was not a campaign contribution and should have been reported on his income tax return. *Id*.

The defendant was convicted of Hobbs Act extortion, and of failing to report the $7,000 as income. *Id*. The jury therefore found that the $7,000 cash payment was ***not*** a campaign contribution, but rather personal income that should have been reported as such. *Id*. at 257-58. In its Supreme Court brief, the government explained how the tax conviction proved that the jury disbelieved the

defendant's claim that the $7,000 payment was a campaign contribution, a conclusion that was consistent with the fact that the defendant "did not treat it in that manner," as he "did not report it; he did not record it among his contributions; and he did not use it to retire current campaign expenses."  Brief for the United States at 45, *Evans*, 504 U.S. 255 (No. 90-6105), 1991 WL 527605, at *45.

The Supreme Court's opinion in *Evans* focused on the cash payment. At the outset of the opinion, the Court wrote:

> Viewing the evidence in the light most favorable to the Government, as we must in light of the verdict, we assume that the jury found that petitioner *accepted the cash* knowing that it was intended to ensure that he would vote in favor of the rezoning application and that he would try to persuade his fellow commissions to do likewise.

*Evans*, 504 U.S. at 257 (emphasis added).  Later in the opinion, the Court also noted that the defendant had instructed the agent on the form of payment, saying "What you do, is make me out one, ahh, for a thousand . . . And, and that means we gonna record it and report it and then the rest would be cash."  *Id*. at 266 n.17. Accordingly, whether or not *Evans* also "involved" a campaign contribution as to the $1,000 check, there was evidence of a much larger personal cash payment, highlighted by the Court, that was not a campaign contribution.[5]

---

[5]     By contrast, in *McCormick*, the Court specifically rejected the government's argument that the jury had concluded that the payments were not campaign contributions.  *McCormick*, 500 U.S. at 275-76.

The government acknowledges this critical distinction: It says that the conviction in *Evans* only "involved" campaign contributions, and that "there was no dispute that *at least part of the bribe* in *Evans* was a campaign contribution." (Br. 23 (emphasis added)). But the government otherwise misses the point. A case involving ***both*** personal cash payments ***and*** campaign contributions does not raise the same concerns as one where the purported bribe consists ***solely*** of campaign contributions. If an official has accepted a personal payment in connection with government business, that official has crossed a line, and the fact that the payment was ***accompanied by*** a campaign contribution does not change the analysis or implicate the rule in *McCormick*.

Because such a payment was made in *Evans*, the concerns addressed in *McCormick*—about prosecutions based solely on campaign contributions as in this case—were not present. There was no need to prove an explicit *quid pro quo* so as to distinguish legitimate campaign contributions from illicit bribes.

Importantly, as the district court noted (A. 37), *Evans* did not state that it was overruling, or even modifying, *McCormick*, decided by the same nine Justices just one year and three days earlier. Aside from the implausibility of a *sub silentio* overruling in those circumstances, all Supreme Court decisions "remain binding precedent until [the Court] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."

27

*Hohn v. United States*, 524 U.S. 236, 252-53 (1998).  The "prerogative" of declaring a Supreme Court decision to have been superseded by a later decision belongs **exclusively** to the Supreme Court.  *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); *accord Agostini v. Felton*, 521 U.S. 203, 237 (1997).

In *Evans*, the Court did not address the First Amendment concerns unique to the campaign-contribution context, on which it had focused at length in *McCormick*.  Instead, it analyzed whether the word "inducement" in the Hobbs Act statute applied to public officeholders, and, if so, whether that word "necessarily indicates that the transaction must be initiated by the recipient of the bribe." *Evans*, 504 U.S. at 266 (emphasis omitted).  Accordingly, even if it were open to this Court to do so, there would be no basis to conclude that *Evans* abrogated or altered the rule in *McCormick* insofar as it applies to cases where the alleged bribes consist solely of campaign contributions.

## II. This Court Has Held That *Evans* Applies in Non-Campaign-Contribution Cases and That, Under *McCormick*, Explicit Means Express

### A. The Law in This Circuit

#### 1. Garcia *and* Ganim *Are Binding Precedent*

The government's claim that *Evans*, rather than *McCormick*, controls here is wrong for another reason: It is directly at odds with the law in this Circuit. This Court clearly held in *Garcia* and *Ganim* that *McCormick* controls in

campaign-contribution cases, and *Evans* in non-campaign-contribution cases. Moreover, this Court held that *McCormick*'s "explicit" standard requires the government to prove that the *quid pro quo* was "express," not simply implicit or inferred. The government does not even attempt to defend its case under that standard.

In *Garcia*, decided the year after *Evans*, this Court reversed a Hobbs Act extortion conviction of a public official because the district court had held that the government need not prove a *quid pro quo* at all. 992 F.2d at 414. This Court clarified that the Supreme Court in *Evans* had extended the *quid pro quo* requirement to non-campaign-contribution cases, albeit under a lesser standard. After noting *McCormick*'s requirement of an "explicit promise or undertaking by the official to perform or not to perform an official act," this Court held that *Evans* had "modified this standard *in non-campaign contribution cases* by requiring that the government show only 'that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'" *Id*. at 414 (emphasis added) (quoting *Evans*, 504 U.S. at 268).

This Court acknowledged that the district court could have properly refused to instruct the jury, under the higher *McCormick* standard, that the defendant must have "received the money in return for an express promise" because the defendant in *Garcia* was not alleged to have received campaign

contributions as bribes. *Id*. But the district court was nonetheless required to give an instruction under the lesser *Evans* standard, which provided that "[t]he official and the payor need not state the *quid pro quo* in express terms." *Id*. (internal quotation marks and citation omitted).

In *Ganim*, the Court again confirmed that *McCormick*'s "express" standard applies in campaign-contribution cases, while the lesser standard under *Evans* applies in non-campaign-contribution cases. 510 F.3d at 142-43. The defendant challenged his conviction for extortion and bribery on the ground that the jury was improperly instructed that it could convict if it found that he received payment in return for a "future, but unspecified, official act." *Id*. at 141-42. Writing for the Court, then-Judge Sotomayor rejected the defendant's challenge, again concluding that the *McCormick* standard—which the Court determined required "proof of an express promise" (and thus, if applicable, would have been at odds with the jury instruction at issue)—applied only in the "special context of campaign contributions." *Id*. at 142. This Court in *Garcia* had "harmonized" the holdings of *McCormick* and *Evans* by making clear that the standard *Evans* articulated applied only in non-campaign-contribution cases. *Id*. at 143. Because the bribes the defendant received in *Ganim* were not campaign contributions, *Evans* rather than *McCormick* controlled, and it was not necessary for the *quid pro quo* in that case to have been express.

Since *Ganim*, and as recently as 2020, this Court has cited and relied on its holdings that *Evans* applies only in non-campaign-contribution cases, and that *McCormick* requires an "express" *quid pro quo*. In *United States v. Rosen*, the Court noted, "Outside the unique context of campaign contributions [citing *McCormick*, 500 U.S. at 273] we have not, in the context of bribery cases, required proof of an express promise regarding the specific official acts to be undertaken as part of the exchange." 716 F.3d at 701. The Court ruled against the defendant, "declin[ing] [his] invitation to expand *McCormick* by requiring proof of an express promise in this [non-campaign-contribution] case." *Id*. In *United States v. Silver*, citing *Garcia*, the Court held again that in *Evans*, the Supreme Court had "modified [*McCormick*'s 'explicit promise'] standard in non-campaign contribution cases." 948 F.3d at 548 (alteration in original) (quoting *Garcia*, 992 F.2d at 414).

The government now claims this precedent is mere "dicta" (which is incorrect), but in prior court filings the government recognized this standard as the law in this Circuit in campaign-contribution cases. (Br. 11, 26-29). In *Rosen*, the government (the same office that is pursuing this case) agreed that in campaign-contribution cases the government must prove an "express" *quid pro quo* agreement, contrasting it with the "implied" agreement applicable in other cases. Brief for the United States of America at 30, *Rosen*, 716 F.3d 691 (No. 12-2249),

31

2012 WL 3900585, at *30 ("[S]ince 1993, this Court has rejected the notion that, *outside the campaign finance context*, the Government must prove an express, rather than an implied, quid pro quo agreement." (emphasis added)). In *Silver*, the government (again this same office) described *Evans* as "the seminal case framing the *quid pro quo* requirement in *the non-campaign-contribution context*." Brief for the United States of America at 34, *Silver*, 948 F.3d 538 (No. 18-2380), 2018 WL 6039487, at *34 (emphasis added). The government also cited *Garcia*—which it called in its brief below in this case "clearly incorrect" (Dkt. 54 at 18 n.7)—in explaining that "*Evans* modified the *McCormick* 'standard in *non-campaign contribution cases* by requiring that the government show only that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'" Brief for the United States of America at 23 n.5, *Silver*, 948 F.3d 538 (No. 18-2380), 2018 WL 6039487, at *23 n.5 (emphasis added) (quoting *Garcia*¸ 992 F.2d at 414). The government also cited the portion of *Ganim* (*see id*. (citing 510 F.3d at 143)) that it now dismisses as "dicta" (Br. 26).

In the Eastern District of New York, the government similarly has recognized that, "in the context of campaign or similar political contributions, the quid pro quo must be express as opposed to implied," noting that "the law as it relates to a quid pro quo involving political contributions is ***different and much***

*more stringent* than when the quid pro quo involves bribes that personally benefit the public official."  Government's Omnibus Memorandum of Law in Opposition to Defendants' Pretrial Motions at 73, *United States v. Mangano*, No. 16-Cr-540 (JMA) (E.D.N.Y. Feb. 9, 2018) (emphasis added).

The government's characterization of the Second Circuit's clearly stated conclusions on this issue as "dicta" is wrong (Br. 11, 26-29), and again at odds with the government's prior citations of *Ganim* and *Garcia*.  Where legal reasoning is necessary to a decision's result, it is not dicta.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66-67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").  This Court's reasoning concerning the application of the respective standards of *McCormick* and *Evans* was necessary to, and intertwined with, the results in *Garcia* and *Ganim*.  In *Garcia*, the Court's interpretation of *Evans* as requiring a *quid pro quo* in non-campaign-contribution cases (albeit under a lesser standard than *McCormick*) was essential to the outcome of the case: The Court reversed the convictions because the district court erroneously believed no such instruction was necessary outside the campaign-contribution context.  992 F.2d at 414-16.  If *Evans* had been a campaign-contribution case, and its holding (like *McCormick*'s) limited to that context, this Court would not have reversed.

In *Ganim*, as in *Garcia*, the Court was required to determine, as a threshold matter, what standard should have been applied to the extortion and bribery charges in that case. 510 F.3d. at 142-44. Citing *Garcia*, *Ganim* drew its critical distinction between *McCormick* and *Evans*, holding that the "express" standard in *McCormick* governed campaign-contribution cases, while *Evans* controlled non-campaign-contribution cases. *Id*. at 142. Applying *Evans* based on this distinction, the Court upheld the "as specific opportunities arise" theory presented in that case, describing the viability of that theory as "a natural corollary" of the standard adopted in *Evans*. *Id*. at 145. Accordingly, the government's portrayal of the Second Circuit's analysis of *McCormick* and *Evans* as an aside or irrelevancy is simply self-serving and inaccurate. *See also Hormel Foods Corp. v. Jim Henson Prods., Inc*., 73 F.3d 497, 508 (2d Cir. 1996) (portion of decision was not dicta because it could not "have been deleted without seriously impairing the analytical foundations of the holding" (citation omitted)).

As the district court held (A. 38), even if the relevant portions of *Garcia* and *Ganim* were dicta (which they are not), the language would still be the kind of dicta—twice considered at length by the Court, and relied on in subsequent decisions and prosecutions—that are entitled to "great weight." *See Patsy's Italian Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 209 (E.D.N.Y. 2007) ("[A]s a general principle, a federal district court is required to give great weight to the

34

pronouncements of its Court of Appeals, even though those pronouncements appear by way of *dictum*."); *cf. United States v. Oshatz*, 912 F.2d 534, 540 (2d Cir. 1990) ("Even if the [Second Circuit] panel's disapproval is regarded as dictum, we think it important to make clear that this is dictum that should have been followed in this case and in subsequent cases. . . . [I]n some contexts expressions of views by an appellate court must be regarded as the law of the circuit, even though not an announcement of a holding or even of a necessary step in the reasoning leading to a holding."). As the district court further explained, "[p]articularly in the context of a criminal case, ignoring repeated and clear—indeed, explicit—rulings by the Second Circuit on the legal standard governing criminal liability for campaign contributions would be inappropriate as well as unfair." (A. 38).

In addition to erroneously describing the Court's conclusions in *Garcia* and *Ganim* as dicta, the government posits that the distinction drawn by the Court in those cases simply goes to whether the "as opportunities arise" theory of bribery is permissible in non-campaign-contribution cases. (Br. 29-33). But the cases themselves say nothing of the sort in describing *McCormick* and *Evans* and are not otherwise supportive of the government's new theory. As the government itself notes, at the time the Court had decided *Garcia*, the Court had yet even to recognize the "as opportunities arise" theory, which was not at issue in the case. (Br. 30). And while *Ganim* affirmed a conviction under that theory, its

characterization of the holdings of *McCormick* and *Evans* was far broader than the government's narrow proposition. Indeed, the reading of *McCormick* that the government proposes would entirely ignore the Supreme Court's animating concern in *McCormick* that legislators not be criminally prosecuted where "they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries." *McCormick*, 500 U.S. at 272. Cabining its rule so that it simply precluded use of the "as opportunities arise" theory in campaign-contribution cases would defy the letter and rationale of the decision.

### 2. *The Due Process Clause Prohibits Imposition of Criminal Liability Here*

Finally, as the district court correctly concluded, imposing "criminal liability in the Second Circuit where the conduct did not clearly involve an 'explicit' *quid pro quo* would create a significant fair-warning problem" under the Due Process Clause, warranting a "stricter interpretation of the 'explicit' *quid pro quo* requirement." (A. 48-49 (citing *United States v. Lanier*, 520 U.S. 259, 266 (1997); *Sash v. Zenk*, 428 F.3d 132, 134 (2d Cir. 2005)). The government has pointed to no prior prosecution in this Circuit based solely on campaign contributions, let alone a case where a court has upheld a bribery charge on a theory as thin as the one set forth in this Indictment against Mr. Benjamin. *See*

*United States v. Brennan*, 183 F.3d 139, 149-50 (2d Cir. 1999) (prosecution was "seriously problematic" where the government "pointed to no precedent for criminal liability" in similar circumstances, and defendants had "substantial reason to conclude" that their conduct did not violate the charged statute). Further demonstrating this fair-warning problem, for thirty years, the distinction that this Court drew in *Garcia* between *McCormick* and *Evans* has stood unchallenged, and has been repeatedly urged by the government.

The government cavalierly says that reversing course now to impose criminal liability on Mr. Benjamin poses no issue because it has always been "plain as a pikestaff" that bribes are illegal. (Br. 40). But this is an entirely circular argument, begging the question of what conduct constitutes bribery based solely on campaign contributions, especially since there has been never been a bribery prosecution based solely on campaign contributions in this Circuit before this case. Nor is it helpful for the government to argue that certain other Circuits have interpreted *Evans* differently (Br. 41); we are in the Second Circuit, where the Court has made clear that the *quid pro quo* must be explicit and express for a bribery prosecution based solely on campaign contributions. Officials and constituents in this Circuit are entitled to rely on that standard until this Court *en banc*, the Supreme Court, or Congress clearly says otherwise.

## B.      <u>The Law in Other Circuits</u>

In light of the law in this Circuit, the government attempts to rely (as it did below) on out-of-circuit authorities to support its claim that an explicit *quid pro quo* can be inferred.  It refers to a supposed "phalanx" of courts of appeals at odds with the district court's decision.  (Br. 41 n.8; *see also* Br. 16-17 (citing cases)).

The government is wrong.  Both the First and the Ninth Circuits agree that *Evans* applies only in non-campaign-contribution cases.  *See United States v. Turner*, 684 F.3d 244, 253 (1st Cir. 2012) ("*Outside of the campaign contribution context*, the Supreme Court set the requirement in [*Evans*], that 'the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'" (emphasis added) (quoting *Evans*, 504 U.S. at 268)), *cert. denied*, 568 U.S. 1018 (2012); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 936-37 (9th Cir. 2009) ("It is well established that to convict a public official of Hobbs Act extortion for receipt of property *other than campaign contributions*, '[t]he official and the payor need not state the *quid pro quo* in express terms. . . .'" (emphasis added) (quoting *Evans*, 504 U.S. at 274 (Kennedy, J., concurring))).

Moreover, in its review of out-of-circuit cases, the government overstates the holdings, and leaves out critical information that entirely

distinguishes the cited cases from this one.  A review of those cases actually

underscores the unprecedented nature of this prosecution.

For example, the government cites *United States v. Blandford* for the

proposition that "[e]xplicit, as explained in *Evans*, speaks not to the form of the

agreement between the payor and the payee, but to the degree to which the payor

and payee were aware of its terms, regardless of whether those terms were

articulated."  (Br. 17 (quoting *Blandford*, 33 F.3d 685, 696 (6th Cir. 1994)).  The

government omits to mention that *Blandford* was not a campaign-contribution case

at all; it involved personal payments, and the court recognized that "no campaign

contributions had in fact been made."  33 F.3d at 698.[6]

Numerous other cases cited by the government involved personal

payments and benefits ***in addition to*** campaign contributions, which take them

outside the ambit of *McCormick* given their non-campaign-contribution evidence

of corruption.  *See United States v. Correia*, 55 F.4th 12, 21-25 (1st Cir. 2022)

(cited at Br. 17) (defendant mayor took personal cash payments and checks from

---

[6]     Although there was no need to do so because the case did not involve
campaign contributions, the Sixth Circuit cited *Garcia* from this Circuit as among
the decisions concluding that *Evans* "establishes a modified or relaxed *quid pro
quo* standard to be applied in non-campaign-contribution cases," while "the
comparatively strict standard of *McCormick* still would govern when the alleged
Hobbs Act violation arises out of the receipt of campaign contributions by a public
official."  *Blandford*, 33 F.3d at 695 (citing *Garcia*, 992 F.2d at 414).

marijuana vendors in return for issuing documents to permit them to operate; one payment was funneled through a campaign contribution into the defendant's "legal defense fund"); *United States v. Davis*, 841 F. App'x 375, 377 (3d Cir. 2021) (cited at Br. 27, 36-37, 43-44 n.9) (defendant bribed a public official by hiring his wife to work at one of his companies and buying the official a home to live in rent-free), *cert. denied*, 142 S. Ct. 401 (2021); *United States v. Blagojevich*, 794 F.3d 729, 733 (7th Cir. 2015) (cited at Br. 16, 21, 29, 35, 39) (defendant governor sought $10 million donation and $1.5 million supposed "campaign contribution," even though he had decided not to run for another term and the "jury was entitled to conclude that the money was for his personal benefit rather than a campaign"), *cert. denied*, 577 U.S. 1234 (2016); *United States v. Terry*, 707 F.3d 607, 610, 615 (6th Cir. 2013) (cited at Br. 16-17, 27, 32-33 n.4, 36, 43-44 n.9, 46) (defendant judge received "financial, campaign and staff support" in addition to campaign contributions), *cert. denied*, 571 U.S. 1237 (2014); *United States v. Tomblin*, 46 F.3d 1369, 1374-75 (5th Cir. 1995) (cited at Br. 17, 28, 36) (defendants bribed a public official by providing him with a $250,000 personal loan through shell corporations, paying for his campaign treasurer's trip to Texas, and promising a stake in companies they controlled).

      The government's other cases further undermine the government's position since they make clear how far short the allegations in the Indictment fall

from the "explicit" *quid pro quo* standard as applied in every circuit. These cases

recognize that the term "explicit" requires much more than the kind of generalities

and supposition relied on by the government in this case. They require, at a

minimum, a clear *agreement*—the critical "*pro*" in a corrupt *quid pro quo*—that a

specific requested use of official power is to be exchanged for specific campaign

contributions.

      For example, in *United States v. Carpenter* (cited at Br. 17-18, 20, 28,

31, 35-38, 43-44 n.9), the court required that "the quid pro quo be clear and

unambiguous, leaving no uncertainty about the terms of the bargain." 961 F.2d

824, 827 (9th Cir. 1992), *cert. denied*, 505 U.S. 919 (1992). There, the *quid pro*

*quo* could hardly have been stated more clearly and unambiguously, as an

undercover FBI agent posing as a businessman directly asked the defendant's aide

"what it's going to cost" to change a state law, and the aide in turn "responded with

a figure of $20,000." *Id*. at 828. Having learned of those terms, the defendant

promised to carry out his end of the bargain by "assist[ing] the bill through the

Senate." *Id*. The court distinguished that conduct from the mere "soliciting of

contributions from constituents who had recently benefited from legislation,"

which under *McCormick* is not criminal. *Id*. at 827; *see also Terry*, 707 F.3d at

615 (as described *supra* p. 40) (alleged *quid pro quo* was so clear that "[n]o subtle

winks and nods were needed"; the donor had "straight up asked [the defendant

41

judge] to deny the bank's motions for summary judgment in the two cases, and with [the defendant's] tape-recorded reply ('Got it.'), [the defendant] agreed to do just that"); *United States v. Siegelman*, 640 F.3d 1159, 1165-67 (11th Cir. 2011) (cited at Br. 17-18, 27, 36, 41 n.8) (defendant governor told a lobbyist that an executive, who wanted control of the state board that had authority over his healthcare business, had to give at least $500,000 to the defendant governor's lottery campaign, and the lobbyist "made it clear" that upon payment, the defendant could not "let [the executive] down" with respect to granting him the specified board seat; after receiving $250,000, the defendant told a confidante that the executive was "halfway there"), *cert. denied*, 566 U.S. 1043 (2012).

It is not surprising that the government avoids discussing any of these cases in detail since they make clear how truly anomalous and unsupportable its prosecution of Mr. Benjamin is here. All of them involved allegations of a corrupt agreement beyond vague statements and temporal proximity, clearly distinguishing the charged conduct from ordinary-course interactions between a public official and constituent. The Indictment in this case puts the concerns raised in *McCormick* and its progeny in sharpest relief, as none before it has—a sitting public official has been charged for allegedly accepting campaign contributions from a constituent in return for providing legitimate constituent services in the form of a grant to a nonprofit serving the educational needs of his district. The

allegations are based purely on inferences the government seeks to draw from the timing and sequence of events, rather than any explicit agreement between the official and constituent.

## III. The District Court Properly Dismissed the Bribery Counts Because They Do Not Allege an Explicit *Quid Pro Quo*

After correctly determining that a *quid pro quo* based on implication and inference cannot suffice to prove bribery in the campaign-contribution context, the district court properly dismissed the bribery charges in the Indictment. The court's decision was based on two grounds, each of which, standing alone, supports the dismissal.

### A. <u>The Bribery Counts Fail to Charge an Essential Element</u>

The district court correctly held that for bribery charges based on campaign contributions, an explicit *quid pro quo* is an element of the bribery offenses that must be alleged in the Indictment. (A. 49-50).

An "element" is "what 'the jury must find beyond a reasonable doubt to convict the defendant.'" *Chery v. Garland*, 16 F.4th 980, 985 (2d Cir. 2021) (quoting *Mathis v. United States*, 579 U.S. 500, 504 (2016)). Although it proposes a different definition of "explicit," the government does not dispute that it is required to prove beyond a reasonable doubt that the alleged *quid pro quo* agreement was in fact explicit. To hold otherwise would be at odds with *McCormick* and the cases that have followed, as well as violate basic principles of

criminal law requiring a jury to find all facts essential to a conviction beyond a reasonable doubt. *See, e.g.*, *United States v. Gonzalez*, 110 F.3d 936, 944 (2d Cir. 1997) ("[T]he Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged." (internal quotation marks and citations omitted)); *United States v. Percoco*, 317 F. Supp. 3d 822, 834 n.18 (S.D.N.Y. 2018) ("[A]n explicit agreement, demand, or other form of inducement is not an element of extortion under color of official right *outside of the campaign contribution context.*" (emphasis added)); *United States v. Davis*, 30 F.3d 108, 109 (11th Cir. 1994) ("[U]nder United States Supreme Court precedent, an explicit promise by a public official to act or not act *is an essential element* of Hobbs Act extortion . . . ." (emphasis added)); *United States v. Donagher*, 520 F. Supp. 3d 1034, 1044-45 (N.D. Ill. 2021) ("[T]he government must allege an explicit *quid pro quo*, as an implied element of the offense, where the 'thing of value' under § 666(a)(2) consists of a campaign contribution.").

As the district court correctly held, where, as here, a statute includes an implied element (i.e., one unstated in the statute itself), it is not sufficient to simply quote the statutory language in an indictment; rather, the implied element must be explicitly alleged.  (A. 49-53).  This is a well-established principle, clearly stated by this Court in *Pirro* (discussed further *infra* pp. 45, 55-56), which, echoing

44

prior Circuit precedent, found that "[w]hen one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and *fails to allege the implicit element explicitly*, the indictment fails to allege an offense." 212 F.3d at 93 (emphasis added) (quoting *United States v. Foley*, 73 F.3d 484, 488 (2d Cir. 1996), *abrogated on other grounds by United States v. Santopietro*, 166 F.3d 88, 92-93 (2d Cir. 1999)); *see also United States v. Davis*, 33 F.4th 1236, 1240 (9th Cir. 2022) ("It is axiomatic that an indictment or information which does not set forth each and every element of the offense fails to allege an offense. . . . This principle applies to implied, necessary elements not included on the face of a statute." (internal quotation marks and citation omitted)); *Gearing v. United States*, 432 F.2d 1038, 1040-41 (5th Cir. 1970); *United States v. Birch*, 470 F.2d 808, 812 (4th Cir. 1972).

As this Court stated in *United States v. Pirro*, this requirement goes not simply to notice, but to ensuring that the grand jury is properly informed as to what it must find in order to indict. *See* 212 F.3d at 92 ("If the indictment does not state the essential elements of the crime, the defendant cannot be assured that he is being tried on the evidence presented to the grand jury, or that the grand jury acted properly in indicting him." (citations omitted)); *see also United States v. Serrano*, 191 F. Supp. 3d 287, 289 (S.D.N.Y. 2016) (citing *Pirro* and dismissing felon-in-possession of body armor count for failing to explicitly allege that the armor was

sold or offered in interstate commerce, an implied essential element of the crime).

This requirement is especially important in a rare bribery prosecution based solely

on campaign contributions. *See Donagher*, 520 F. Supp. 3d at 1046 ("[E]nsuring

that the grand jury considered the explicit *quid pro quo* element in the context of

campaign contributions is anything but a technicality; to the contrary, given the

controlling law, doing so is necessary to shield ordinary, constitutionally protected

campaign financing activities from criminal prosecution.").

Here, the Indictment does not allege an explicit *quid pro quo*. While

***conceding*** that "the Indictment does not literally say that [Mr.] Benjamin engaged

in an 'explicit *quid pro quo*'" (Br. 45), the government relies on two sentences in

the Indictment alleging that Mr. Benjamin sought and received campaign

contributions "in exchange for" the $50,000 grant to FPSH (Br. 43). But those

words describe nothing more than the kind of *quid pro quo* the government must

allege in any bribery case, including those where the alleged bribes do not consist

of campaign contributions. An "exchange" is not synonymous with an explicit or

express agreement. As the district court found, "[a] person gives something 'in

exchange for' something else in any *quid pro quo*," including "an implicit *quid pro

quo* under the *Evans* standard for non-campaign-contribution cases," which does

not apply in this case. (A. 51).

46

The government cites *United States v. Ng Lap Seng*, 934 F.3d 110, 116-18 (2d Cir. 2019), and *United States v. Blandford*, 33 F.3d at 688, to support its position that "in exchange for" suffices in this context, but neither is relevant here. (Br. 43). *Ng Lap Seng* involved personal payments funneled through sham consulting and other contractual agreements to United Nations officials, and not campaign contributions to a political campaign; the case, accordingly, was not decided under the *McCormick* standard.[7] 934 F.3d at 117-18. And as noted *supra* p. 39, the Sixth Circuit's decision in *Blandford* involved personal cash payments rather than campaign contributions (in addition to suggesting that the Sixth Circuit might interpret *McCormick* and *Evans* differently than did this Court in *Garcia* and *Ganim*, *see supra* note 6). 33 F.3d at 695, 698. Similarly, *United States v. Seminerio* (cited at Br. 46) involved a stream of cash payments

---

[7]  *Ng Lap Seng* referenced *McCormick* in a "*cf.*" cite in a footnote, after citing *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999), a case that, like *Ng Lap Seng* itself, did not involve campaign contributions. 934 F.3d at 117 n.4. In *Sun-Diamond*, the Supreme Court explained that to prove bribery there "must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act." 526 U.S. at 404-05 (emphasis added). In contrast, the parenthetical accompanying this Court's *McCormick cf.* citation in *Ng Lap Seng* describes *McCormick* as "holding that elected official can commit Hobbs Act extortion for receiving campaign contributions if payments are made 'in return for an explicit promise or undertaking by the official to perform or not to perform an official act.'" 934 F.3d at 117 n.4 (quoting *McCormick*, 500 U.S. at 273). The Court thus made clear that *McCormick* set forth a different standard, applicable in the campaign-contribution context.

disguised as consulting fees, rather than campaign contributions.  No. S1 08-Cr-1238 (NRB), 2010 WL 3341887, at *1-3 (S.D.N.Y. Aug. 20, 2010).  *Terry*, as described *supra* pp. 40-42, involved a "flow of benefits" in the form of "financial, campaign and staff support."  707 F.3d at 615.  And in *United States v. Pawlowski* (cited at Br. 46), the indictment alleged a long pattern of pay-to-play bribery that also involved personal benefits like football tickets and a steak dinner.  Indictment, No. 5:17-Cr-390-JS (E.D. Pa. Dec. 5, 2017), 2017 WL 3380968.

Finally, the government relies on *United States v. Santeramo*, 45 F.3d 622 (2d Cir. 1995), a case decided before *Pirro* and *Foley*.  In *Santeramo*, however, this Court agreed that the implicit element at issue (knowledge, in a § 924(c) firearm prosecution) needed to be alleged in the indictment.  *Id.* at 624.  The Court affirmed the defendant's conviction because the indictment's allegations—namely, that he had used or carried a firearm during and in relation to the drug trafficking offenses charged elsewhere in the indictment—sufficiently alleged the element of knowledge.  As the Court pointed out, those words "fairly import[] the knowledge requirement of section 924(c)" because "a person cannot have possession or control of a firearm and allow the firearm to play a role in the

48

crime unless the person knew of the firearm's existence." *Id.* (citation omitted).[8]

Here, there is nothing in the Indictment alleging that there was an explicit or express *quid pro quo* exchange, much less clearly and specifically making such an allegation, as *Pirro* and *Foley* require. Instead, as described *supra* pp. 3, 7, the Indictment purports to allege an implicit *quid pro quo*, to be inferred from the timeline of events and Mr. Benjamin's alleged vague statement, "Let me see what I can do."[9]

---

[8]       The defendant had pleaded guilty to the offense and admitted in his allocution that he drove to a diner for the purpose of selling cocaine, with three handguns in the trunk, which he took along "in case there was a problem with the selling of the drugs." *Id.* at 623.

[9]       The government writes in its brief that, "After Benjamin told Migdol about the grant, Migdol understood Benjamin to be offering a *quid pro quo*—$50,000 to fund FPSH in return for Migdol providing contributions to Benjamin." (Br. 5). Even leaving aside the legal irrelevance of what Migdol "understood," there is no such allegation in the Indictment. The government's citation for this assertion is "Dkt. 52-2," which is in fact an FBI-302 Report, attached as an exhibit to a filing below, purporting to reflect the substance of a statement Migdol made to the government in the course of his post-arrest efforts to cooperate. Moreover, the text of that exhibit makes clear that Migdol in fact told the government that Mr. Benjamin was *not* explicit:

> Despite BENJAMIN *not being explicit in BENJAMIN's intent with the grant*, after the June 20 text message, MIGDOL "*put together*" BENJAMIN's "let me see what I can do" comment and the fact BENJAMIN was pursuing a $50,000 grant for MIGDOL's charity.

(Dkt. 52-2 at 2 (emphasis added)). Notably, at the oral argument on Mr. Benjamin's motion to dismiss, the government conceded that, in his numerous proffer sessions with the government, Migdol had not described an "express *quid*

49

Accordingly, the district court correctly ruled that the bribery counts in the Indictment fail to allege the implied element of an explicit *quid pro quo*, and properly dismissed the charges on that basis.

### B. The Bribery Counts Do Not Sufficiently Allege a Crime

The district court also properly dismissed the bribery counts on the separate basis that the factual allegations in the Indictment, even if true, do not constitute the crime of bribery based solely on campaign contributions because those allegations do not describe an explicit *quid pro quo* agreement between Mr. Benjamin and Migdol. (A. 53). In so doing, the district court correctly applied *McCormick*, as well as this Court's precedents in *Pirro* and *Aleynikov*. Those cases, discussed further below, along with the district court cases cited in the court's opinion (A. 53-54), hold that a court can and should dismiss charges where the factual allegations pleaded in the indictment fail to allege a crime within the terms of the applicable statute.

As the district court observed, *McCormick* itself held that campaign contributions are criminal in this context only if they are "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act," further explaining that "[i]n such situations the official asserts that his

---

*pro quo*," while continuing to claim that it was nevertheless somehow "explicit." (Dkt. 64 at Tr. 70:14-16).

official conduct *will be controlled* by the terms of the promise or undertaking."
(A. 54 (quoting *McCormic*k, 500 U.S. at 273)).  Here, the facts alleged in the
Indictment do not amount to any agreement at all, much less one that is explicit, or
one where Mr. Benjamin "assert[ed] that his official conduct [would] be controlled
by the terms of" any promise or undertaking.  (*Id*.).

The Indictment alleges that Migdol and Mr. Benjamin first discussed
Mr. Benjamin's fundraising efforts for his upcoming race for New York City
Comptroller at a meeting on March 8, 2019.  Migdol told Mr. Benjamin that he
lacked experience bundling small contributions, his fundraising efforts were
focused on the nonprofit FPSH, and he thought the potential donors for the
comptroller campaign were likely to be the same donors to the nonprofit.  In
response, Mr. Benjamin allegedly said: "Let me see what I can do."  (A. 4-5).

Accepting the allegations as true, this was far from an explicit
agreement to take official action in return for a bribe.  Mr. Benjamin did not agree
to obtain a grant for FPSH in return for contributions to his comptroller campaign,
and Migdol did not agree to procure contributions if Mr. Benjamin did so.  The two
could not have made any such agreement because, as alleged in the Indictment,
Mr. Benjamin did not even learn that funding for such a grant would be available
until nearly three months after the March 8 meeting, on May 30, 2019.  (A. 6).

On that date, Mr. Benjamin allegedly called Migdol to advise that he intended to seek the grant, but there is no allegation that Mr. Benjamin sought assurances that he would receive campaign contributions in return, or that Migdol agreed to provide them. (*Id.*). Subsequently, when the grant was announced, Migdol expressed surprise that his nonprofit had received it. (A. 7 ("[D]oes it mean what I'm hoping?")). On July 8, Migdol allegedly provided Mr. Benjamin with contributions to his campaign for *senate*, rather than his campaign for comptroller—the latter being the campaign involving small-dollar contributions that the two men had allegedly discussed at the March 8 meeting, and (under the government's theory) the reason Mr. Benjamin sought to obtain the grant to the nonprofit in the first place. (*See* A. 7-8). Even still, Migdol did not say that he was making the contributions in return for the grant. These detailed allegations thus further undercut, rather than substantiate, any argument that the Indictment alleges an explicit *quid pro quo* agreement on March 8 or any time thereafter.

The sole remaining allegations relating to this issue are two purported statements by Mr. Benjamin, long after the March 8 meeting, and after the grant was announced. At the July 8 meeting where Migdol provided support for his senate campaign, Mr. Benjamin allegedly "reminded" Migdol of the grant, and stated that he "still expected" Migdol to obtain contributions for his comptroller campaign. (A. 8). And, in October 2019, Mr. Benjamin allegedly called Migdol

52

and "specified the types of contributions that [he] expected [Migdol] to procure."

(A. 9-10).  These, too, fall far short of an explicit *quid pro quo*.  They were made

after the grant was announced, and Mr. Benjamin and Migdol are not alleged to

have explicitly agreed, during these conversations or any others, that the

contributions were to be made in exchange for the grant.  And, although the

Indictment alleges that Mr. Benjamin "retained the ability to alter or withdraw" the

grant, it does not allege that Mr. Benjamin ever told Migdol that he would do so

should Migdol fail to provide campaign contributions, much less that he said any

such thing explicitly.  (A. 10).

       The government argues that the district court erred because Count

Two requires only a corrupt solicitation, Count Three "requires neither a meeting

of the minds nor an official's intent to keep up his end of the proposed *quid pro*

*quo*," and Count One requires only an agreement, "not any particular actions taken

to further it."  (Br. 47).  But as the government concedes elsewhere (Br. 24), the

charged statutes require proof in the campaign-contribution context of an ***explicit***

***quid pro quo*** agreement, whether or not it was ultimately realized.  The theory of

liability alleged in the Indictment is that Mr. Benjamin agreed to provide the grant

in return for contributions to his comptroller campaign.  And the key issue raised

by the Indictment is the one the district court properly focused on: Accepting all of

the facts alleged in the Indictment as true, Mr. Benjamin did not explicitly promise,

53

offer, agree, or undertake to obtain the $50,000 grant to FPSH in return for campaign contributions from Migdol.

In reaching that conclusion, the district court was correct to highlight that Mr. Benjamin is alleged to have sought and obtained the allocation from the senate (as well as to have advised Migdol that FPSH had received it) *before* Mr. Benjamin told Migdol that he "still expected" Migdol to obtain campaign contributions, or "reminded" him of the grant. (A. 54-55). This allegation is patently deficient under *McCormick*, as it depends entirely on inference to establish a promise, undertaking, or agreement to take official action in return for campaign contributions, and does not allege any assertion by Mr. Benjamin that his official conduct would be controlled by the terms of any promise, undertaking, or agreement. *See McCormick*, 500 U.S. at 272 (officials should not be criminally prosecuted simply because "they act for the benefit of constituents or support legislation furthering the interests of some their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries"). Indeed, even the government's view of *McCormick* requires that "the terms of the *quid pro quo* [be] clear and unambiguous." (Br. 31 (internal quotation marks and citation omitted)). That means, at the very least, settled—as opposed to "still in the process of [being] negotiat[ed]," as the government weakly claims the bribes might have been here. (Br. 48).

Finally, the government argues that the district court overreached by dismissing the counts before trial where the government had not made a "full proffer" of its evidence, citing *United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998), *United States v. Sampson*, 898 F.3d 270 (2d Cir. 2018), and *United States v. Wedd*, 993 F.3d 104 (2d Cir. 2021). The government relies on the district court's statement that "[w]hile the government has every right to present more evidence at trial, the Court can 'fairly . . . describe' the Indictment as something much closer to a 'full proffer' than the indictment at issue in *Alfonso*." (A. 57 (quoting *Alfonso*, 143 F.3d at 776)). This was certainly an accurate statement, given that the government confirmed that the fourteen pages of speaking allegations in its Indictment "lay[] out clearly the prosecution's theory" and "contain[] detailed allegations specifying the crimes charged." (Dkt. 52-5 at 2 (internal quotation marks omitted)). At the same time, the government consigns to a footnote its discussion of this Court's decisions in *Pirro* and *Aleynikov*, on which the district court (and Mr. Benjamin in the briefing below) principally relied. It fails to distinguish those cases or otherwise show that they do not control here.

The government acknowledges that in *Pirro* this Court upheld the pretrial dismissal of counts in an indictment because of the "indictment's failure to plead a specific fact at issue." (Br. 51 n.11). In *Pirro*, the defendant was charged with violating 26 U.S.C. § 7206(1), a statute that prohibits willfully making and

subscribing a federal income tax return that is false as to a material matter. 212 F.3d at 89. As here, the relevant portion of the indictment substantially tracked the language of the statute, alleging that the defendant knowingly failed to report and thus misstated the "ownership interest" held in the corporation by the chairman of a hospital board. *Id*. at 88. But the Court held that, under the terms of the relevant tax filing and applicable law, the defendant was required only to report the ownership interests of *shareholders*. *Id*. at 90. The indictment had failed to allege that the chairman was a shareholder—a "crucial background fact that g[ave] rise to the duty to disclose the [information] that was omitted"—and accordingly to allege that the statute had been violated. *Id*. at 93. This Court affirmed the pretrial dismissal of the Indictment even though the government "strongly argue[d] that the Chairman was a de facto shareholder, held a beneficial interest, or that [the defendant] was a nominee," noting that the "government failed to take advantage of the [defendant's] request for a bill of particulars to make the general term 'ownership interest' more specific and legally sufficient." *Id*. at 94-95.

In *United States v. Aleynikov*, which the government erroneously categorizes as dealing with "matters of pure statutory construction" (Br. 51), the

indictment was deemed insufficient on the same basis.[10]  The defendant was

charged with violating the National Stolen Property Act, which prohibits the

transportation in interstate commerce of goods known to have been stolen.  676

F.3d at 74 (citing 18 U.S.C. § 2314).  Again, the allegations in the indictment

recited the statutory language, adding that the defendant had, without

authorization, uploaded to a server and downloaded to his personal device his

former employer's proprietary source code, which he then brought to an out-of-

state meeting.  *Id*. at 73-74.  But the Court held that the facts alleged did not

constitute a crime because the indictment failed to allege that the defendant

"physically seized anything tangible . . . such as a compact disc or thumb drive

containing source code," as the statute required.  *Id*. at 78.  *See also United States

v. Heicklen*, 858 F. Supp. 2d 256, 275-76 (S.D.N.Y. 2012) (dismissing indictment

where facts alleged did not constitute the crime of attempting to influence the

actions of a juror); *United States v. Kerik*, 615 F. Supp. 2d 256, 271-74 (S.D.N.Y.

2009) (dismissing false statement charge based on allegations in the indictment

because defendant's alleged failure to disclose information in response to a

--------

[10]     *Aleynikov* was decided following trial, but at issue on appeal was the district court's denial of the defendant's pretrial motion to dismiss.  In its decision, the Court made clear that it was addressing the sufficiency of the indictment (which is the way the parties framed the issue) and held the indictment "legally insufficient" in light of its deficient factual allegations.  676 F.3d at 75, 76 n.3.

question that the court determined was "fundamentally ambiguous" was not a crime as a matter of law).

The government's brief wholly ignores the legal standard applied in these cases, noting only that most concerned "whether statutes applied to undisputed, dispositive facts." (Br. 51 n.11). But here, too, the district court accepted all factual allegations as true in considering the bribery counts. (A. 25 n.1). The issue is whether what is alleged constitutes an offense under the charged statutes. And, as in *Pirro* (where the allegations described a general "ownership interest," rather than the ownership interest of a shareholder) and *Aleynikov* (where the government alleged the defendants had stolen source code, rather than a tangible item), the alleged facts here are deficient because they describe at best a general bribery scheme rather than one predicated on an explicit *quid pro quo*.

The district court correctly held that, even if true, the bribery allegations in the Indictment failed to set forth a violation of the charged statutes, and properly dismissed Counts One through Three on that separate basis.

## **<u>CONCLUSION</u>**

For the reasons stated above, the District Court's Opinion and Order appealed from should be affirmed.

Dated: New York, New York
       March 17, 2023

Respectfully submitted,

KRAMER LEVIN NAFTALIS &
FRANKEL LLP

By: /s/ Barry H. Berke
    Barry H. Berke
    Dani R. James
    Darren LaVerne
    1177 Avenue of the Americas
    New York, NY 10036
    Telephone: 212.715.9100

*Attorneys for Defendant-Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

Barry H. Berke, an attorney for Defendant-Appellee Brian Benjamin,

hereby certifies that:

1.     This brief complies with the type-volume limitation of Fed. R. App.

P.32(a)(7) and Local Rule 32.1(a)(4)(A), because it contains 13,917 words,

excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

because this document has been prepared using a proportionally spaced typeface

using Microsoft Word in Times New Roman 14-point font.

Dated:  March 17, 2023

By: /s/ Barry H. Berke
Barry H. Berke