# 22-3091

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆━◆━◆

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

—against—

BRIAN BENJAMIN,

*Defendant-Appellee,*

GERALD MIGDOL, AKA SEALED DEFENDANT 1, AKA GERALD MIGOL,

*Defendant.*

―――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICI CURIAE* CURRENT AND FORMER NEW YORK ELECTED GOVERNMENT OFFICIALS IN SUPPORT OF DEFENDANT-APPELLEE

HARRY SANDICK
BONITA ROBINSON
PATTERSON BELKNAP WEBB
& TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Amici Curiae
Current and Former New York
Elected Government Officials*

# TABLE OF CONTENTS

Page

STATEMENT OF INTEREST OF AMICI CURIAE ...............................................1

PRELIMINARY STATEMENT .................................................................................3

ARGUMENT ...............................................................................................................7

    I.    The Charges Against Mr. Benjamin Created A Risk To The Democratic Process And Were Correctly Dismissed .........................7

    II.    Campaign Contributions Are Among The Highest Forms Of Protected First Amendment Activity .....................................................8

    III.    *McCormick* Recognized That Campaign Contributions Are Protected Speech And That Prosecutions For Campaign Contributions Should Be Based Only On An Explicit Quid Pro Quo Agreement .............................................................................10

    IV.    The Government's Watered-Down Proposed Rule Cannot Be Reconciled With The Supreme Court's Recent Public Corruption And Campaign Finance Decisions .................................13

        A.    The Supreme Court Consistently Has Rejected Prosecutions Of Public Officials That Rest On Expansive Interpretation Of Federal Criminal Statutes.............................13

        B.    The Supreme Court Consistently Has Rejected Limitations On Campaign Finance Because Of Their Impermissible Burden On Protected Speech ...........................16

    V.    The Government's Watered-Down Rule Will Interfere With The Democratic Process And Lead To Unjust Prosecutions Based On Innocent Conduct.................................................................17

CONCLUSION ........................................................................................................22

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Buckley v. Valeo*,
424 U.S 1 (1976) ...........................................................................8, 9

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) ...........................................................................9

*Evans v. United States*,
504 U.S. 255 (1992) ...........................................................................7

*Fed. Election Comm'n v. Cruz*,
142 S. Ct. 1638 (2022) ...................................................................9, 17

*Kelly v. United States*,
140 S. Ct. 1565 (2020) .....................................................................15

*Marinello v. United States*,
138 S. Ct. 1101 (2018) ...................................................................21, 22

*McConnell v. Fed. Election Comm'n*,
540 U.S. 93 (2003) ...........................................................................16

*McCormick v. United States*,
500 U.S. 257 (1991) ....................................................................*passim*

*McCutcheon v. Fed. Election Comm'n*,
572 U.S. 185 (2014) ..................................................................9, 16, 17

*McDonnell v. United States*,
579 U.S. 550 (2016) ............................................................13, 14, 15, 21

*McNally v. United States*,
483 U.S. 350 (1987) ...........................................................................14

*Monitor Patriot Co. v. Roy*,
401 U.S. 265 (1971) ...........................................................................8

*Ognibene v. Parkes*,
671 F.3d 174 (2d Cir. 2011) .............................................................16

*Smith v. Goguen*,
415 U. S. 566 (1974) .......................................................................... 21

*United States v. Ganim*,
510 F.3d 134 (2d Cir. 2007) .............................................................. 12

*United States v. Garcia*,
992 F.2d 409 (2d Cir. 1993) .............................................................. 12

*United States v. Sun-Diamond Growers of California*,
526 U.S. 398 (1999) .................................................................... 15, 19

## STATEMENT OF INTEREST OF AMICI CURIAE[1]

We are current and former elected officials in New York State. We have served in federal, state, and city government, as legislators and executive branch officials. Our political affiliations may vary, and we often disagree about policy issues and about how our state and country should be governed. Nonetheless, we have come together because we are gravely concerned that the legal standard proposed by the government in this appeal is one that will change the existing rules for campaign fundraising and criminalize ordinary, innocent—indeed, necessary—conduct by elected officials and by their constituents. We seek to provide our unique perspective on the implications of the government's position.

For this reason, the individuals listed in Appendix A submit this *amicus curiae* brief in support of Defendant-Appellee Brian Benjamin, urging affirmance of the district court's dismissal of the bribery charges brought against him.[2] The district court properly held the government to the explicit *quid pro quo* standard that historically has governed campaign contribution cases. Constituents and elected

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), counsel certifies that (1) this brief was authored entirely by counsel for *amici curiae*, and not by counsel for any party, in whole or in part; (2) no party and no counsel for any party contributed money intended to fund preparing or submitting the brief; and (3) apart from counsel, no other person contributed money intended to fund preparing or submitting the brief.

[2] The government and the Defendant-Appellant have consented to the filing of this *amicus* brief. Accordingly, this brief may be filed without leave of court, pursuant to Fed. R. App. 29(a)(2).

officials must be able to make and receive campaign donations while also discussing issues of public policy without fear of investigation, prosecution or punishment: the explicit *quid pro quo* standard in cases involving a donation to a candidate's campaign (rather than a personal gift to the candidate) is what allows them to do so. By contrast, the government's proposed standard would make it impossible for constituents and elected officials alike to know when they are running afoul of the law and would open the door to prosecutions based on suspicion and surmise. Moreover, that standard would chill elected officials from engaging with their constituents (or prospective constituents) to understand the issues that are important to them—a principle at the very core of a representative democracy. It is no overstatement to say that if the government's rule is adopted, it will cause grave damage to the democratic values that underlie our political system. At a minimum, it will deter constituents from participating in the political process, discourage elected officials from engaging with our constituents, and lead to unjust investigations and prosecutions.

In order to protect the core values of the democratic system that we cherish, we ask the Court to affirm the district court's decision, reject the government's proposed standard, and make clear that the explicit *quid pro quo* rule still governs in cases involving campaign contributions.

2

## PRELIMINARY STATEMENT

For decades, elected officials and candidates for office have taken comfort in the Supreme Court's rejection of the misguided notion that legislators break the law "when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received[.]" *McCormick v. United States*, 500 U.S. 257, 272 (1991). Allowing elected officials to be prosecuted for voting in favor of policies that are supported by donors to their campaigns "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures[.]" *Id.* In order to avoid the prosecution of conduct that is both innocent in intent and unavoidable given our system of campaign finance, the Supreme Court has held that the acceptance of campaign contributions can form the basis for criminal prosecution "only if the payments are made in return for an ***explicit*** promise or undertaking by the official to perform or not to perform an official act." *Id.* at 273 (emphasis added).

When the government charged Brian Benjamin with bribery offenses arising out of his receipt of campaign contributions from a constituent affiliated with a nonprofit supporting Harlem schoolchildren that received a state grant, it did not allege the type of explicit *quid pro quo* that the Supreme Court requires. For this

3

reason, the district court dismissed the charges against Mr. Benjamin prior to trial, concluding that the government's charges were brought in error.

On appeal, the government compounds its charging error by asking this Court to enfeeble the Supreme Court's explicit *quid pro quo* requirement so that its prosecution of Mr. Benjamin can proceed. The government proposes a standard under which it is required neither to allege nor to prove the existence of an express agreement in order for the government to charge an elected official with bribery in connection with campaign contributions. Rather, the government proposes that the required *quid pro quo* "need not be . . . openly expressed in any particular words" but can be inferred from the conduct of the parties.[3] (Gov't Br. 12). The government says that it should be allowed to prove campaign contribution bribery cases based only on layers of inference "implied from the official's words and actions," as opposed to evidence of an explicit *quid pro quo*. (Gov't Br. 18, 21) (citation omitted). In other words, the government seeks to eliminate the Supreme Court's requirement of ***explicitness*** from the "***explicit***" *quid pro quo* test.

The government's proposed standard is inconsistent with the governing law as stated by the Supreme Court and this Court, for the reasons explained in detail in both the decision below and in Mr. Benjamin's brief. As current and former

---

[3] "Gov't Br." refers to the brief filed by the government in this appeal; and "A." refers to the joint appendix filed along with the government's brief in this appeal.

elected officials, we write separately to focus on another concern particular to our experience, which is that the government's rule will put under the microscope every interaction between a campaign donor and a candidate for office or a sitting elected official. The government asks this Court to empower prosecutors and federal agents to examine whether an elected official cast a vote based on his or her long-standing commitment to a particular policy objective or because of persuasive advocacy from a constituent, as opposed to an illegal, explicit *quid pro quo*. Without requiring that this *quid pro quo* be explicit—express and clear, as opposed to inferred and vague— elected officials and constituents alike will lack clear guidelines marking whether their actions may subject them to investigation and prosecution. This will deter the type of open exchange and constituent service that courts have long recognized to be essential to democracy. Even if the bribery charges are ultimately found to be meritless—as they were found to be in Mr. Benjamin's case—the impact of the investigation on the lives of elected officials and our constituents will be dramatic, irreversible, and devastating.

The government ignores that campaign contributions are a fundamental aspect of the rights of political speech and free association protected by the First Amendment. The rules that obtain in other bribery cases—where the benefit conferred on the elected official is tangible and personal, such as an expensive watch or a fur coat—do not obtain in the context of campaign contributions. A watch or

coat is a gift of personal property conferred on the elected official for his or her own private benefit, not a form of speech by constituents that is protected by the First Amendment and is essential to our political system.

For this reason, the government must tread lightly when it comes to initiating prosecutions based on a decision to donate money to a political campaign, or to act in the hope of inspiring such donations. Since *McCormick*, the Supreme Court has held over and over again and in a multiplicity of contexts that courts should be reluctant to permit prosecutions of government officials other than in the clearest cases of corruption and wrongdoing. In advocating for its implicit promise rule, the government overlooks these decisions and pays little more than lip service to their First Amendment implications.

In this brief, we review the importance of political speech and discuss the decades-long trend in Supreme Court jurisprudence that has limited the reach of federal criminal law in order to safeguard the essential attributes of our democratic process. As current and former elected officials, we respectfully ask this Court to consider the danger to democratic values that is posed by the government's proposed rule and to affirm the decision below, rather than to lower the legal standard required to bring a bribery charge when the alleged bribe is a campaign contribution.

## **ARGUMENT**

I. **The Charges Against Mr. Benjamin Created A Risk To The Democratic Process And Were Correctly Dismissed**

When the government charged Mr. Benjamin in an indictment barren of any allegations that he entered into an explicit *quid pro quo* agreement with a constituent, he moved to dismiss the charges as inconsistent with the *McCormick* explicit *quid pro quo* rule. The district court granted the motion, carefully reviewing *McCormick*, the subsequent decision in *Evans v. United States*, 504 U.S. 255 (1992), and this Court's prior interpretation of these cases. (A. 31-38). The district court conducted a thorough analysis of the meaning of the phrase "explicit promise" and rejected the argument that "the Court can't really have meant explicit" when it used precisely that word. (A. 41).

Beyond its review of the controlling decisional law, the district court also considered how discarding or limiting the explicit *quid pro quo* standard would harm our democracy. In particular, the district court saw that the First Amendment implications of the requisite standard "are not tangential to the validity of the prosecution, but rather central to it." (A. 48). The district court also cautioned that action taken by candidates "in the hope that it will yield campaign contributions is not a bribe," but "a basic aspect of the American political system." (*Id.*). "Because campaign contributions implicate the very foundations" of this system, "the *McCormick* Court was careful to delineate the boundary between permissible and

7

impermissible conduct when public officials are raising money from the same people they are elected to represent." (A. 47).

This Court should give great weight to these constitutional principles when deciding the government's appeal. The outcome of this appeal will not only impact Mr. Benjamin; it will impact how elected officials, candidates for office, and constituents all participate in our democracy. We discuss these principles related to democratic values in greater detail below.

## II.    Campaign Contributions Are Among The Highest Forms Of Protected First Amendment Activity

This is a case about campaign contributions, which, as the district court held, play a central role in our democracy. For decades, the Supreme Court has instructed that the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272 (1971). A campaign contribution "serves as a general expression of support for the candidate and his views" and also "serves to affiliate a person with a candidate." *Buckley v. Valeo*, 424 U.S 1, 21-22 (1976). It necessarily follows that the ability to make campaign contributions is "integral to the operation of the system of government established by our Constitution." *Id*. at 14.

As the Supreme Court has held over and over again, the First Amendment's guarantee of the rights of political expression and political association shield campaign contributions from most forms of regulation or prohibition. "If the

First Amendment has any force, it prohibits Congress from fining or jailing citizens . . . for simply engaging in political speech." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 349 (2010). While political speech in the form of campaign contributions may be restricted for "the prevention of '*quid pro quo*' corruption or its appearance," *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1652 (2022); *see also Buckley*, 424 U.S. at 26 (same), the government may not pursue a "prophylaxis-upon prophylaxis approach" to that end that broadly sweeps in innocent conduct. *Cruz*, 142 S. Ct. at 1652-53.

　　　　While we, as current and former elected officials, unanimously affirm that actual corruption is to be deplored, "the Government may not seek to limit the appearance of mere influence or access." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 208 (2014) (plurality opinion). Rather, influence and access "embody a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." *Id*. at 192. The Supreme Court has recognized that even while "[t]he line between *quid pro quo* corruption and general influence may seem vague at times, . . . the distinction must be respected in order to safeguard basic First Amendment rights," and courts must "err on the side of protecting political speech rather suppressing it." *Id*. at 209 (citation omitted). The interpretation of the

criminal law should support and not undercut the Supreme Court's emphasis that campaign contributions are protected free speech.

**III.**   ***McCormick* Recognized That Campaign Contributions Are Protected Speech And That Prosecutions For Campaign Contributions Should Be Based Only On An Explicit *Quid Pro Quo* Agreement**

Given the important role that campaign donations play in our democratic system and their special protection under our First Amendment, it is no surprise that the Supreme Court and the Second Circuit have taken care to narrowly read bribery and extortion statutes in the context of public corruption cases. Unlike the government's proposed standard here, the standards the Courts have articulated aim to avoid sweeping in innocent conduct or deterring protected First Amendment activity.

In *McCormick*, the Supreme Court made clear that campaign contributions can form the basis for criminal charges "only if the payments are made in return for an ***explicit*** promise or undertaking by the official to perform or not to perform an official act." 500 U.S. at 273 (emphasis added). Like the district court here, the Supreme Court grounded its rule in democratic process, explaining in some detail the rationale for its concern that prosecutors not overstep narrow bounds when considering whether to prosecute elected officials for receiving campaign contributions.

10

The Court first recognized that "[s]erving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator." *Id*. at 272. In other words, legislators need to work on behalf of their constituents to press for policies that those constituents support. The Court also understood the practical realities of modern campaigns and the need to finance those campaigns—realities that in our experience have only intensified since *McCormick* was decided in 1991. As the Court explained, "campaigns must be run and financed" and "[m]oney is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done." *Id*.

Again focusing on the practical realities faced by elected officials and our constituents, the Court reasoned that "whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant" when it passed the Hobbs Act. *Id*. In other words, a rule that prevents constituents and candidates or elected officials from advancing the interests of the other would carry with it serious consequences for our system of government by "open[ing] to prosecution not only conduct that has

11

long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation." *Id*.

This is the foundation upon which the *McCormick* explicit *quid pro quo* rule rests, and it helps explain why the rule has neither been overruled by the Supreme Court nor narrowed by this Court. Nor has there ever been any doubt about its meaning in this Circuit, as this Court has twice restated the meaning of this phrase. *See United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007) ("Proof of an express promise is necessary when the payments are made in the form of campaign contributions."); *United States v. Garcia*, 992 F.2d 409, 414 (2d Cir. 1993) ("[T]he *McCormick* Court had ruled that extortion under color of official right in circumstances involving campaign contributions occurs 'only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act.'" (quoting *McCormick*, 500 U.S. at 273)). In the "special context" of a case involving campaign contributions, an "express promise" is necessary for the conduct to be criminal. *Ganim*, 510 F.3d at 142.

*McCormick* allows elected officials, candidates for office, and constituents to each play their part in the political process. Candidates for office are allowed to raise money from those constituents who wish to express their support. Constituents are encouraged to state their views and to advocate to their elected

officials, asking that they take positions that will advance their views and interests. And candidates, if elected, may then take those positions. Under *McCormick*, no crime has been committed absent an ***explicit*** *quid pro quo* between the elected official and the constituent for official action in exchange for a contribution. This is and should remain the law.

**IV.** **The Government's Watered-Down Proposed Rule Cannot Be Reconciled With The Supreme Court's Recent Public Corruption And Campaign Finance Decisions**

The district court's decision was consistent with *McCormick* and the twin trends of Supreme Court decisions in the past several decades, namely, placing limits on the ability of prosecutors to interfere in the political process and rejecting restrictions on First Amendment-protected campaign finance activities.

**A.** **The Supreme Court Consistently Has Rejected Prosecutions Of Public Officials That Rest On Expansive Interpretation Of Federal Criminal Statutes**

The Supreme Court has repeatedly clipped the wings of prosecutors, recognizing that an expansive interpretation of federal criminal statutes in the context of prosecuting government officials will "raise significant constitutional concerns." *McDonnell v. United States*, 579 U.S. 550, 574 (2016). While many of these decisions do not directly relate to the specific issue in Mr. Benjamin's appeal, when taken together they demonstrate that the Supreme Court will not permit

13

prosecutors to advance broad or novel arguments in support of its public corruption prosecutions.

For example, these concerns animated the Supreme Court's decision in *McDonnell* to limit the definition of official acts in the context of bribery prosecutions and to reject the government's suggestion that "nearly anything a public official does" is an official act. *Id.* at 575. As the Court explained, "conscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time." *Id.* If all of these forms of constituent service were to be treated as official acts, then "[o]fficials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse." *Id.* As we have seen in our careers, constituent service and responsiveness to the community are the touchstone of elected public service.

In the same spirit, the Supreme Court has taught that federalism concerns are also implicated whenever the federal courts "construe a statute in a manner that . . . involves the Federal Government in setting standards of disclosure and good government for local and state officials." *McNally v. United States*, 483 U.S. 350, 360 (1987); *see also McDonnell*, 579 U.S. at 576-77 (holding that states have "the prerogative to regulate the permissible scope of interactions between state officials and their constituents" and citing *McNally*). The Supreme Court reiterated

14

the point recently, in the context of the infamous "Bridgegate" scandal. Even where—unlike in this case—the conduct underlying that "Bridgegate" prosecution was concededly improper, the Court admonished prosecutors not to "use the criminal law to enforce ([their] view of) integrity" in state and local politics. *Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020).

Likewise, in *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999), the Supreme Court read the federal anti-gratuity statute to require that a gratuity paid to a government official be linked to a particular official act in order for it to be criminal. Absent this linkage, an over-zealous prosecutor could charge the president with a crime for accepting a ceremonial jersey from a sports team that visits the White House after winning a championship title. *Id*. at 406-07. Indeed, the prosecutor in *Sun-Diamond* stated that it would be a crime if a group of farmers provided a complimentary lunch to the Secretary of Agriculture in connection with his speech to those farmers. *Id*. at 407. "[N]othing but the government's discretion prevents the foregoing examples from being prosecuted." *Id*. at 408. Just as in *McDonnell*, the Court was alert to the dangers posed by a broad reading of federal criminal statutes.

Taken together, these decisions are important to elected officials. We seek engagement with the voters and our supporters and the community at large, and

this Court should follow the Supreme Court's careful approach in recent cases involving allegations of public corruption.

### B. The Supreme Court Consistently Has Rejected Limitations On Campaign Finance Because Of Their Impermissible Burden On Protected Speech

Similarly, the Supreme Court has "spelled out how to draw the constitutional line" between government efforts to "avoid corruption in the political process," and efforts that—even while gesturing to this concern—primarily function to "limit speech." *McCutcheon*, 572 U.S. at 192. In seeking to draw those lines, the Court has understood that "a legitimate and substantial reason" to contribute to a candidate "'is that the candidate will respond by producing those political outcomes the supporter favors.'" *Ognibene v. Parkes*, 671 F.3d 174, 204 (2d Cir. 2011) (Livingston, C.J., concurring in part) (quoting *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 297 (2003) (Kennedy, J., concurring in the judgment in part and dissenting in part)).

As a corollary to this fundamental principle, "government regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford." *McCutcheon*, 572 U.S. at 192. Indeed, only last year the Supreme Court denied that contributions should be limited or restricted even in contexts in which the contributor had particular assurance that the public official could or would take action favorable to

16

him. *Cruz*, 142 S. Ct. at 1652 (rejecting restrictions on "particularly troubling" post-election contributions that allegedly "raise a heightened risk of corruption").

The government's proposed rule eviscerates the line the Supreme Court has sought to maintain, at the expense of elected officials and their constituents. Permitting prosecution in this context based on only an implicit agreement would too easily and impermissibly blur the distinction between, on the one hand, the (entirely appropriate) expectation that public officials will act on supporters' concerns and, on the other, a corrupt bribe. *See McCutcheon*, 572 U.S. at 209 ("[T]he distinction must be respected in order to safeguard basic First Amendment rights."). The government's brief on this appeal—which devotes just a single, casual paragraph to the First Amendment implications of its proposed rule (Gov't Br. 39-40)—makes clear that it has not adequately considered these concerns.

## V. The Government's Watered-Down Rule Will Interfere With The Democratic Process And Lead To Unjust Prosecutions Based On Innocent Conduct

If the Court accepted the government's invitation to dilute the explicit *quid pro quo* requirement in *McCormick*, any elected official who accepted a campaign contribution would necessarily feel constrained from taking official acts that were in favor of the campaign donor, in case an over-zealous prosecutor should decide that, in the government's words, a *quid pro quo* can "be implied from the official's words and actions." (Gov't Br. 21) (citation omitted). Any time a

17

government official considered taking a step that would assist a campaign donor, he or she would need to engage counsel to conduct careful analysis about whether such an action is permitted, or else face prosecution for otherwise innocent activity. More likely, many elected officials will decide to minimize contact with constituents who are campaign donors lest such contact form the basis for a criminal bribery charge. A rule of law that discourages interactions between elected officials and their constituents is not a good rule.

Likewise, a constituent who hoped to persuade an elected official to take some official action on an issue the constituent believed to be important might conclude that making a campaign contribution to the elected official would put her or him at risk of criminal prosecution, and thereby be deterred from engaging in the core protected First Amendment activity of making campaign contributions. Constituents might even fear that making a donation to a candidate who shared their views would make it harder for the elected official to take action in support of those views, out of the candidate's concern that such actions would be viewed as an illegal *quid pro quo*. A rule of law that discourages core protected free speech by threatening the criminal investigation and prosecution of those who would engage in it is not a good rule.

Just as in *Sun-Diamond*, it is not hard to imagine the types of hypothetical prosecutions that the government could bring if this Court agrees that the explicit *quid pro quo* rule should be diluted. For example:

- A state legislator holds a meeting with constituents who are focused on the issue of climate change. The constituents seek to persuade her that certain policy measures should be adopted to reduce the rate of increase in the global average temperature.

  Under the government's standard, if she votes for those measures after accepting campaign contributions from constituents who attended the meeting, both she and her constituents can be investigated or even charged, even in the absence of any "explicit promise."

- A city council member meets separately with representatives of both an organization that represents taxi drivers and the management of a private car service to hear their views on policy changes relating to traffic congestion. Each side calls for placing limits on the other's ability to provide car service. In the aftermath of these meetings, some attendees make donations to the candidate's campaign; the strong majority of the donations are made by the private car service and its executives. The council member makes no explicit promises to either side of this dispute other than to consider seriously their advice. He then votes for the policies advocated by the private car service.

  Under the government's standard, he is subject to investigation in order to determine whether layers of inference could suggest that the vote was cast in exchange for the political donations.

- A candidate running for office holds an informal "meet and greet" with potential constituents. The candidate states her position on important issues affecting the district. Liking what he hears, a constituent states that he would be excited to contribute to a candidate who espouses those positions. The candidate responds that the constituent can "count on me" to stick to her principles. The constituent makes a donation to the candidate's campaign before leaving. The candidate, subsequently elected, votes consistently with the positions she described at the "meet and greet."

19

Under the government's standard, both the candidate and the constituent could be investigated or even charged because, in the government's view, the candidate and constituent implicitly entered a *quid pro quo* agreement.

In none of these real-world hypotheticals was there anything like an explicit *quid pro quo* and yet in all of these cases, the government could investigate or even prosecute individuals for conduct that is commonplace and unremarkable in the current political system. Innocent conduct along the lines of the conduct described in the hypotheticals above should not be the basis for criminal investigation and prosecution.

Even the investigations themselves, whether or not followed by charges or a successful prosecution, would achieve a punitive end, tarnishing the elected official's record and forcing him to spend considerable funds to engage counsel in order to defend against the charges. The official's family, friends, associates, and political allies could also face similar consequences. This minefield created by the government's proposed rule will also discourage speech, impede interactions between elected officials and their constituents, advantage self-funded candidates who do not need to engage in the campaign fundraising process, and lead to unwarranted investigations and prosecutions. No rule that brings about these results is a good rule.

Of course, the Court does not require these hypotheticals to understand the harm the government's position would cause: the Court need look no further than

the prosecution of Mr. Benjamin that is the subject of this appeal. Mr. Benjamin worked for many years to build a successful career in public service and he had recently become the lieutenant governor of New York State, only to be forced to resign because of charges that amount to little more than his acceptance of campaign donations from a constituent months after he supported a state grant to a nonprofit dedicated to supporting Harlem schoolchildren. All of us will only see more of this type of prosecution if the government's diluted rule becomes the law of the Circuit.

Finally, the Court should consider the risk of selective prosecution. Without an explicit *quid pro quo* requirement, this risk would be even greater than it already is today. This is because when a criminal statute is read broadly, it "risks allowing 'policemen, prosecutors, and juries to pursue their personal predilections.'" *Marinello v. United States*, 138 S. Ct. 1101, 1108 (2018) (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974). To guard against such risk, the Supreme Court has repeatedly warned that courts "cannot construe a criminal statute on the assumption that the [g]overnment will 'use it responsibly,'" *id.* at 1109 (quoting *McDonnell*, 579 U.S. at 576), rather than in a manner that "result[s] in the nonuniform execution of [prosecutorial] power across time and . . . location," *id.* This caution regarding the impropriety of relying on prosecutorial discretion is particularly appropriate in the context of public corruption cases, where there is a heightened risk of selective prosecution based on an elected official's views or votes or even the appearance

21

thereof, which "undermin[es] necessary confidence in the criminal justice system."
*Id*.

## **CONCLUSION**

For the reasons stated above, the Court should affirm the dismissal of

the indictment.

Dated:     New York, New York
            March 24, 2023

Respectfully Submitted,

By:   /s/ Harry Sandick
     Harry Sandick
     Bonita Robinson
     PATTERSON BELKNAP WEBB &
     TYLER LLP
     1133 Avenue of the Americas
     New York, New York 10036
     (212) 336-2000

     *Counsel for Current and Former New York Elected Government Official Amici*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5), 32(a)(7)(B) and Local Rule 32.1, because it contains 5,163 words, calculated by the word processing system used in its preparation, and excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

Dated:      March 24, 2023
            New York, New York

                              PATTERSON BELKNAP WEBB & TYLER LLP


                              /s/ Harry Sandick
                              Harry Sandick
                              1133 Avenue of the Americas
                              New York, NY  10036-6710
                              Telephone:  (212) 336-2000
                              Fax:  (212) 336-2222

                              *Counsel for Current and Former New York Elected Government Official Amici*

23

# APPENDIX A*

New York State Senator Marisol Alcantara (ret.)

New York State Assemblymember Michael Blake (ret.)

New York State Assemblymember Karim Camara (ret.)

New York City Councilmember Robert Cornegy (ret.)

New York State Assemblymember Inez Dickens

Manhattan Borough President C. Virginia Fields (ret.)

New York State Assemblymember Edward Gibbs

New York State Assemblymember Walter Mosley (ret.)

New York State Assemblymember Annette Robinson (ret.)

United States Representative Max Rose (ret.)

New York State Assemblymember Frank Seddio (ret.)

New York State Assemblymember Al Taylor

New York City Councilmember David Yassky (ret.)

---

* *Amici curiae* appear in their individual capacities; institutional affiliations are provided here for identification purposes only.

24